F I L E D
United States Court of Appeals
Tenth Circuit

OCT 1 1999

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

MARIBEL QUINTANILLA,

Defendant-Appellee.

No. 97-2332

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-94-320-MV)

---

Richard A. Friedman, Appellate Section, Criminal Division, Department of Justice, Washington, D.C. (John J. Kelly, United States Attorney, and Fred J. Federici, Assistant United States Attorney, with him on the brief), for the appellant.

Barbara A. Mandel, Assistant Federal Public Defender (Ann Steinmetz, Federal Public Defender, with her on the brief), Las Cruces, New Mexico, for the appellee.

---

Before **SEYMOUR**, Chief Judge, **BALDOCK,** and **BRISCOE**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

The United States appeals from the district court's grant of defendant's motion for a new trial following her conviction for conspiracy to possess, and possession with intent to distribute one kilogram or more of methamphetamine. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

I.

On April 29, 1994, defendant Maribel Quintanilla, driving a Dodge Ram Charger truck with Texas plates, was stopped at a United States Border Patrol checkpoint in Alamogordo, New Mexico. In response to questioning from an agent regarding her itinerary, defendant stated she had been traveling from El Paso, Texas, to Alamogordo. She claimed her half-brother, [1] Adan Aleman, [2] owned the vehicle. Defendant gave a series of conflicting stories regarding the purpose of her visit, several of which contained information the agent knew to be false. Following this discussion, the agent directed defendant to a secondary inspection area adjacent to the checkpoint and asked if he could examine the truck in greater detail. Defendant consented.

Examination of the underside of the truck revealed multiple scratches on the vent hose and shiny new bolts on the gas tank, suggesting the tank recently

---

[1] Defendant described the exact nature of the relationship in different ways.

[2] Aleman often employed the aliases Alfredo Ortiz and, according to the government, Sam Ortiz. Unless otherwise noted, we refer to him as Aleman.

had been removed and replaced. With defendant's consent, the agent brought a drug-detection dog to the scene, and the canine alerted to the tank. As other officers removed the tank, defendant asked the agent what would happen to her and her two children (who were passengers in the truck) if drugs were found inside. The agent told defendant she would be arrested in such a scenario. Upon removing the tank, officers discovered a metal box inside containing thirty-five pounds of ninety-two percent pure methamphetamine. A subsequent registration check revealed the license plate on the truck was registered to a different vehicle belonging to an individual from Pecos, Texas. Defendant was then arrested.

After being advised of her Miranda rights, defendant told Agent Susan Sanchez she had traveled from her home in Los Angeles to Jurarez, Mexico, with her daughters and Aleman. At the time of her arrest, defendant maintained she was en route to a party in Alamogordo and was driving a truck loaned to her by Aleman. She claimed she planned to return the truck to Aleman in Alamogordo and then fly back to Los Angeles with her children. In an attempt to verify these statements, Sanchez drove defendant to the site of the alleged rendezvous point, but Aleman was nowhere to be found.

That same day, Sanchez phoned defendant's husband, Tomas Quintanilla, in California to alert him to his wife's arrest and the need to pick up his children. Upon arriving the next day, defendant's husband agreed to assist authorities in

-3-

locating Aleman. Specifically, in the event Aleman called defendant's home in Los Angeles looking for her, defendant's husband directed his stepson, who remained at the residence, to tell Aleman defendant was in Alamogordo having her truck repaired. Sanchez gave the stepson a phone number where defendant could be reached which, although purportedly that of the repair garage, actually went to Sanchez' cellular phone.

The next evening, April 30, 1994, Aleman (identifying himself as Alfredo Ortiz) called Sanchez' cellular phone. Sanchez told him defendant was not available but that her truck was being serviced in the shop. Aleman phoned back the following morning at which time Sanchez told him defendant had paid for all repairs, returned to Los Angeles with her husband, and left a note stating the owner of the truck would be coming to pick up the vehicle. Aleman promised he (as the purported owner) would arrange to have the truck retrieved. He called again later that afternoon and stated an individual named Manny Bautista would be arriving from El Paso to pick up the vehicle.

When Bautista arrived, Sanchez required him to verify his permission from the truck's owner to take the vehicle. Bautista called Aleman on Sanchez' phone, and Aleman verified to Sanchez that Bautista was acting at his direction. Aleman also offered two telephone numbers and an address where he could be reached. The address he gave was that of defendant's prior residence in Los Angeles. One

of the phone numbers he gave was traced to an El Paso home owned by Adan Saranda.[3] That number was also the one Bautista had used to contact Aleman. As Bautista got in the truck to drive off, he was immediately arrested.

That same day, defendant wrote a note to Agent Sanchez from her jail cell indicating Aleman could be found at the El Paso home of Saranda. The note, translated from Spanish, read:

> Will you please follow Aleman, and you will find that you will find something out. The name is Adan Saranda. This is the address. And the true name is Salvador Gallegos, but he goes by the name of a deceased person in Michigan. The address is here. I got it. Please watch him, and you will not regret it.

R. Vol. X at 750. Phone records later revealed that on April 26, 1994, three days before defendant's arrest, two phone calls were made from Saranda's El Paso home to defendant's current Los Angeles residence. In addition, on April 30, 1994, the day after defendant's arrest, four calls were made from Saranda's El Paso home to defendant's current Los Angeles home.

After Bautista had been arrested and advised of his rights on May 1, 1994, he agreed to make a controlled delivery of methamphetamine. At the direction of federal agents, Bautista phoned Aleman at Saranda's El Paso address and stated the truck was leaking gas and needed repairs. Aleman directed Bautista to drive

---

[3] Adan Saranda often used the aliases Salvador Gallegos and Alan Salamo. For purposes of consistency, we refer to him as Saranda.

the vehicle to a designated location in Los Angeles. Accompanied by federal agents, Bautista followed Aleman's directive. Once he and the agents arrived at the specified spot, Bautista called Saranda. Saranda picked up Bautista and the two drove to meet with Luis Viveros, who was driving a red Toyota registered to defendant. Following a brief discussion, the parties went their separate ways. After dropping Bautista at the airport, Saranda went to a residence in Pico Rivera, California and picked up Viveros. The two then drove to the location of the Dodge Ram Charger truck and returned it to the garage of the Pico Rivera home.

Within a short period of time, federal agents surrounded the Pico Rivera residence, executed a search warrant, and arrested Saranda and Viveros. Agent Sanchez testified the home looked like a "stash house." She observed there was no refrigerator or stove in the kitchen, none of the cabinets had been cleaned, and trashbags were scattered everywhere with remnants of fast food restaurant purchases. Additionally, agents found $8900 in cash hidden inside a hollowed-out plastic entertainment center and two nine-millimeter handguns. In the garage, agents found a rivet gun, rivets, silicone, and other tools necessary to seal a false compartment on a gas tank. Although not disclosed to the jury, agents also seized 264.7 grams of methamphetamine and 53.7 grams of marijuana. Sanchez noted that, in her experience, such surroundings often reflect the type of environment used by individuals involved in narcotics trafficking.

Several items seized in the residence were connected to defendant. In one of the bedrooms, agents discovered a Western Union money gram receipt of $300 sent by Viveros to defendant on April 29, 1994, the day of her arrest. In the interior of the house and in the garage, agents also found numerous receipts with defendant's name and Los Angeles address. Further, telephone records reflected that in the two months preceding the search of the Pico Rivera residence, fifty-nine telephone calls had been made from that residence to Saranda's El Paso home.

Defendant, along with Aleman and Viveros, was indicted in May 1994 in the District of New Mexico for conspiracy to possess, and possession with intent to distribute one kilogram or more of methamphetamine. Approximately two months before trial, the court granted defendant's motion to sever. As a result of a flurry of pre-trial motions, the court continued the trial setting on multiple occasions. The latest trial date, ordered upon defendant's motion, was April 10, 1995.

On April 4, 1995, defendant filed a motion for a continuance of the trial, slated to begin in six days. Defendant moved for a continuance to permit Viveros' trial to be concluded first so his testimony might become available to defendant in her trial. Defendant's counsel stated, *inter alia*, that he had spoken with Viveros' attorney and learned Viveros planned to deny knowing defendant,

claim he was driving defendant's red Toyota because a third-party had loaned it to him, and state he had wired money to defendant at the direction of a third-party. The motion for continuance further states Viveros' attorney had informed defendant's counsel that Viveros would assert his Fifth Amendment rights if called as a witness prior to the completion of his trial. Based upon these representations from Viveros' attorney, defendant requested a continuance of her trial to permit the government to proceed with Viveros' case first. (On the date this motion was filed, Viveros had not yet agreed to plead guilty.) The court denied this motion in a minute order without explanation before trial on April 10, 1995.

On Friday, April 7, 1995, three days before defendant's trial was to begin, and three days after defendant had filed her motion for a continuance, Viveros gave a statement to Agent Danny Garcia of the Drug Enforcement Administration (DEA). By this date, Viveros had agreed to plead guilty, although he had not yet entered a plea or negotiated a plea agreement. According to Garcia's interview summary, Viveros stated (1) the Pico Rivera residence belonged to Sam Ortiz, [4] (2) Viveros had wired $300 to defendant at Sam Ortiz' request, (3) Viveros had no familiarity with defendant or her family prior to his arrest, and (4) Viveros

---

[4] The government maintains Sam Ortiz is one of Aleman's aliases. Defendant suggests there is no evidence of such a connection.

believed the red Toyota, which was titled to defendant, belonged to Sam Ortiz. These statements essentially mirrored the allegations set forth in support of defendant's April 4, 1995, motion for a continuance.

Defendant's trial commenced on April 10, 1995. Taking the stand herself, defendant insisted she had no knowledge of the methamphetamine concealed in the truck's gas tank. She testified that three days before her arrest, she traveled with her children and Aleman to Jurarez, Mexico, to assist Aleman and his wife in bringing their children illegally into the United States. She stated she agreed to do so because Aleman's wife is her niece and the two are very close. This alleged relationship to Aleman was different from the connections defendant had claimed to authorities on previous occasions. During her brief time in Juarez, she claimed she and Aleman went to Saranda's home in El Paso to "get to know" Texas. She insisted she knew Saranda only as a car salesman and Aleman's boss. While at Saranda's house, defendant stated she made two phone calls to her Los Angeles home to request that her family send her credit cards. In attempting to explain the note regarding Saranda that she wrote to Agent Sanchez from her jail cell, defendant stated she was merely directing agents to where Aleman might be found.

As she had told Border Patrol authorities, defendant testified Aleman loaned her the Dodge Ram Charger truck so she could travel to Alamogordo with

her daughters. She maintained that when she was stopped at the border checkpoint, she lied about her travel itinerary out of a fear officers would arrest the Aleman family, whom she was helping to enter the United States illegally. She also conceded she continued to lie to federal agents about this matter following her arrest and during the period of her purported cooperation with federal authorities.

In explaining why Viveros was driving her red Toyota at the time of his arrest, defendant stated she had received the car as a gift from Aleman the previous month. Two days prior to her departure for Juarez, she loaned the car to Aleman and had not seen it since. Her husband testified to the same facts. As far as the receipts in her name found in the Pico Rivera residence, she claimed she had put the receipts in the glove compartment of her Toyota, but had no idea how the receipts got into the house. She insisted, however, she never had been inside the Pico Rivera residence.

Defendant's brother, Juventino Moreno, then testified he had traveled to Mexico in March 1995 (a year after defendant's arrest) to look for Aleman . On March 29, 1995, Moreno allegedly found Aleman and convinced him to write a two-sentence letter stating the Dodge Ram Charger truck belonged to him, and he tricked defendant into driving the vehicle by asking her to accompany him to Alamogordo for family reasons. After Aleman purportedly signed the unnotarized

letter in Moreno's presence, Moreno faxed it to defendant's counsel and allegedly destroyed the original by throwing it in a well. Moreno also allegedly convinced Aleman to call the Federal Public Defender's investigator, who taped the conversation, and say that defendant had no knowledge of the methamphetamine secreted in the truck's gas tank. (The government filed a motion in limine to exclude this evidence under Fed. R. Evid. 804(b)(3), but the district court denied the motion as well as the government's contemporaneous trial objection.) [5]

On April 20, 1995, the jury found defendant guilty of both counts charged in the indictment. On April 27, 1995, defendant filed a motion for new trial pursuant to Fed. R. Crim. P. 33. In her motion, defendant argued she "believed" Viveros had exculpatory information, and proceeded to assert the identical allegations regarding Viveros' purported testimony referenced in her April 4, 1995, motion for a continuance. Only after her trial commenced, defendant stated, did she learn of Viveros' purported intention to invoke his Fifth Amendment rights until his formal sentencing. Defendant argued Viveros' testimony was newly discovered evidence and asked the court to delay ruling "until counsel is able to gather further information to support this motion." R.

---

[5] Rule 804(b)(3), which applies to "unavailable" declarants, provides that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Vol. II, Doc. 185.

On August 30, 1995, Viveros' sentencing hearing was conducted before the same judge who was presiding over defendant's trial. Viveros, who is an illegal alien, sought a downward departure based on aberrant behavior. Viveros testified to largely the same information defendant cited in support of her pre-trial motion for continuance and motion for new trial. Specifically, Viveros stated (1) he did not know defendant or her husband; (2) a third-party[6] had instructed him to take the red Toyota, which was parked at the Pico Rivera residence and which Viveros did not know was registered to defendant, and help another person, whom he later learned was Saranda, pick up the Dodge Ram Charger truck; and (3) he had wired money to defendant via Western Union upon the third-party's instruction.

Viveros also denied the Pico Rivera residence was a "stash house." He testified that at the time of his arrest, he had been staying at the home as a guest of an unidentified individual in Mexico who had facilitated his (Viveros') illegal entry into the United States. Contrary to photographs, affidavits and sworn testimony of federal agents searching the home, Viveros insisted the house was kept relatively clean and the kitchen had a refrigerator and ample cooking utensils. Viveros admitted knowing of the existence of one gun in the house, but

---

[6] Viveros identified the third-party as Sam Ortiz. The government suggests Viveros was referring to Aleman.

maintained he never saw a second gun, any illegal drugs, the $8900 found by the agents, or the tools located in the garage . Defendant maintains she was not aware before this hearing that Viveros considered the Pico Rivera residence anything other than a stash house.

On October 23, 1995, defendant filed a supplemental motion for new trial based upon newly discovered exculpatory evidence. In the motion, defendant argued in greater detail that Viveros' testimony was exculpatory to defendant and his testimony satisfied all of the requirements set forth in United States v. Sutton, 767 F.2d 726 (10th Cir. 1984), for granting a motion for new trial based upon newly discovered evidence. On February 20, 1996, the district court convened a hearing on defendant's motion for new trial. Defendant called Viveros to the stand and he echoed the testimony he gave at his own sentencing hearing. At the conclusion of the hearing, the court took defendant's motion under advisement. On March 13, 1996, defendant filed an additional supplemental motion for new trial. In this motion, defendant asserted the government's failure to provide defendant with the information it received from Viveros when he was interviewed prior to defendant's trial. On September 10, 1997, the court issued an opinion granting defendant a new trial. The court held (1) the statements Viveros gave to DEA Agent Garcia before trial reflected information unknown to defendant, (2) if the court had been informed Viveros would be asserting his Fifth Amendment

-13-

privilege before defendant's trial commenced, it would have granted defendant a continuance until after the completion of Viveros' sentencing, and (3) the government's failure to turn over the summary of DEA Agent Garcia's interview with Viveros constituted a Brady violation.

II.

Federal Rule of Criminal Procedure 33 authorizes a district court to grant a new trial if required in the interests of justice. [7] Although a trial court is afforded discretion in ruling on such a motion, and is free to weigh the evidence and assess witness credibility, Tibbs v. Florida, 457 U.S. 31, 37-38 & n. 11 (1982), a motion for new trial is regarded with disfavor and should only be granted with great caution. United States v. Sinclair, 109 F.3d 1527, 1531 (10th Cir. 1997). We ordinarily review such rulings for an abuse of discretion. Id. If a new trial motion is based on an alleged Brady violation, however, we review the district court's ruling de novo. United States v. Gutierrez-Hermosillo, 142 F.3d 1225, 1232 (10th Cir.), cert. denied, 119 S. Ct. 230 (1998); United States v. Hughes, 33

---

[7] Rule 33 provides: "On a defendant's motion, the court may grant a new trial to the defendant if the interests of justice so require. . . . A motion for a new trial based on newly discovered evidence may be made only within three years after the verdict or finding of guilty. . . . A motion for a new trial based on any other grounds may be made only within 7 days after the verdict or finding of guilty or within such further time as the court may fix during the 7-day period." The quoted rule includes minor changes made in December 1998, none of which have any relevance to this case.

F.3d 1248, 1251 (10th Cir. 1994).

Defendant based her original new trial motion on one ground: "newly discovered evidence." She supplemented the motion with additional evidence and later filed an additional supplemental motion asserting a <u>Brady</u> claim. In granting defendant's motion, the district court divided its analysis into two categories: (1) Rule 33's "interest of justice" prong, and (2) prosecutorial <u>Brady</u> violations. The court examined defendant's allegedly newly discovered evidence in its "interest of justice" analysis, holding this provision obviated the need to examine the newly discovered evidence claim under the traditional standards applicable to such a theory. As discussed below, the court misconstrued the standard for evaluating new trial motions and, in the process, abused its discretion in granting defendant a new trial.

**Newly Discovered Evidence Claim**

Under Rule 33, if a new trial motion is filed within seven days after the verdict, the defendant may request a new trial on *any basis* that is required in the interest of justice. After the seven-day period has expired, however, a defendant's new trial request may be granted *only* on the basis of newly discovered evidence. A number of circuits have stated, without any substantive explanation and often in dicta, that a motion for new trial which is based on

-15-

newly discovered evidence and is asserted within seven days after the verdict, is subject to a heightened discretion standard. See United States v. Schlei, 122 F.3d 944, 990-91 (11th Cir. 1997); United States v. Pinkney, 543 F.2d 908, 916 n.56 (D.C. Cir. 1976); United States v. Rachal, 473 F.2d 1338, 1343 (5th Cir. 1973); but see United States v. Johnson, 26 F.3d 669, 682 (7th Cir. 1994) (motion for new trial based on newly discovered evidence is subject to same rigorous standard irrespective of its filing date). We reject this reasoning. The "interest of justice" standard applies to *all* motions for new trials, including those predicated on newly discovered evidence. In *defining* "interest of justice" in the context of a newly discovered evidence claim, however, courts have established a multi-pronged test. See Sinclair, 109 F.3d at 1531. If this test were not applied to "newly discovered evidence" new trial motions asserted within seven days after the verdict, defendants would have no diligence obligation and could keep an evidentiary trump card in the event of a conviction. Such a rule also would penalize convicted defendants who discover exculpatory evidence more than seven days (but within three years) after the verdict. Rule 33 dictates no such result. [8]

---

[8] Even under the case law establishing a discretion continuum for new trial motions based on the timing of the motion, the district court's approach here is troublesome. The cases identified all involved new trial motions based on newly discovered evidence *known at the time the motion was asserted*. It is a perversion of Rule 33 to allow a defendant to deliberately manipulate the standard by filing a boilerplate motion for new trial, predicated on "newly discovered evidence,"

(continued...)

-16-

The proposed Viveros testimony cited as the basis for granting defendant a new trial can be divided into two categories: (1) Viveros' statements to Agent Garcia three days before defendant's trial, and (2) Viveros' testimony at his own sentencing hearing and at defendant's new trial motion hearing. A five-part test must be applied in determining whether this "newly discovered evidence" warrants a new trial. Defendant must show (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by her own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal. Sinclair, 109 F.3d at 1531 (citations omitted).

The substance of Viveros' April 7, 1995, interview with Agent Garcia was known to defendant well before her trial commenced. The only comments potentially helpful to defendant elicited in that interview were Viveros' suggestions that (1) the Pico Rivera residence belonged to Aleman, (2) Viveros had wired $300 to defendant at Aleman's request, even though Viveros did not know defendant, (3) Viveros had no familiarity with defendant or her husband, and (4) Viveros believed the red Toyota titled to defendant belonged to Aleman.

_____

[8](...continued)
within seven days after the verdict, and then ask the court to refrain from ruling while the defendant attempts to gather new evidence.

-17-

This evidence clearly does not warrant a new trial as it was not "newly discovered." Indeed, defendant cited the same information six days before trial in support of her motion for a continuance. Moreover, as we describe in detail below, the evidence would not have been material to her defense.

With respect to evidence elicited at Viveros' sentencing and defendant's new trial motion hearing, the only information both potentially helpful and unknown to defendant prior to trial was Viveros' description of the Pico Rivera residence as a clean, fully-equipped home which did not serve as a "stash house." Importantly, however, defendant satisfied none of the Sinclair elements regarding this evidence. Defendant's counsel employed no diligence in attempting to gather this information. Counsel did not call Viveros as a witness at trial, nor did counsel adduce any testimony outside the jury's presence that Viveros would assert his Fifth Amendment rights and not testify until he had been formally sentenced. Further, defendant concedes in her brief that her attorney "never spoke with Viveros until the hearing on [defendant's] motion for new trial was held on February 20, 199[6]." Appellee's Br. at 32.

None of Viveros' proposed testimony would have been material to the principal issues involved in the case. His statements regarding the Pico Rivera residence, at best, would have impeached the credibility of the agents conducting the search of the home. The critical issue in this case was whether defendant had

-18-

prior knowledge of the drugs hidden in the Dodge Ram Charger truck. The government never argued defendant's guilt hinged on her presence at the Pico Rivera residence. Evidence of her connection to the residence was designed only to show that her association with Aleman was more extensive than a single trip to Juarez to help his family enter the United States illegally. Nor would Viveros' testimony regarding his lack of familiarity with defendant have undermined any aspect of the government's case. Proof of defendant's knowledge of the drugs was tied to proving her relationship with *Aleman*; her prior encounters (if any) with *Viveros* were immaterial. Evidence, newly discovered or otherwise, which touches only on issues tangential to defendant's defense, cannot serve as an adequate foundation for granting a new trial. See <u>Sinclair</u>, 109 F.3d at 1531.

Although not explicitly stated, it appears the district court may have based its granting of a new trial, at least in part, on a concern that it erred in denying defendant's pre-trial motion for a continuance. In our view, however, the court had no jurisdiction to consider that ground as defendant did not raise the issue in her new trial motion. With the exception of newly discovered evidence claims, a defendant's new trial motion based upon other grounds must be raised within seven days following the verdict. <u>United States v. Hamilton</u>, 457 F.2d 95, 99 (3d Cir. 1972). The time limitations imposed by Rule 33 are jurisdictional in nature. <u>United States v. Miller</u>, 869 F.2d 1418, 1420 (10th Cir. 1989). Other than a claim

of newly discovered evidence, "a defendant may not add new arguments in support of a motion for new trial by including them in an amendment filed after the time under Rule 33 has expired." [9] United States v. Custodio, 141 F.3d 965, 966 (10th Cir.), cert. denied, 119 S. Ct. 243 (1998); Anthony v. United States, 667 F.2d 870, 875-76 (10th Cir. 1981). Nor may the court grant a new trial on a basis not asserted by the defendant. United States v. Newman, 456 F.2d 668, 670 (3d Cir. 1972).

Defendant insists the district court's holding is supported by United States v. Patterson, 41 F.3d 577 (10th Cir. 1994). In Patterson, defense counsel expressly informed the jury that defendant's brother would be testifying as a key defense witness in the case. When the brother was called to the stand, however, he could not be located. Defendant sought a continuance, but the court denied the request and defendant was convicted at the end of the one-day trial. In his motion for a new trial, defendant maintained the denial of his continuance request rendered his trial unfair. Through an affidavit attached to the motion, defendant's brother stated his truck had broken down while he ran an errand during a noon recess in the trial and he could not locate anyone until the trial had concluded.

---

[9] Brady claims can be a subspecies of newly discovered evidence claims. Thus, assuming the Brady materials were in the government's possession, and unknown to defendant at the time of trial, a defendant may assert a Brady claim more than seven days after the verdict.

-20-

Following a hearing, the court granted defendant a new trial.

Patterson is readily distinguishable from the instant action. First, and most important, the defendant in Patterson raised the continuance argument in his timely filed motion for new trial. The district court in Patterson thus had jurisdiction to consider the continuance argument. Second, defense counsel in Patterson explicitly promised the jury it would hear from the defendant's brother at trial. When the jury's expectations were unfulfilled, the trial court concluded an inference had been raised that the brother's testimony was unfavorable to the defense, thereby prejudicing the defendant. Id. at 579 & n.2. No such prejudice is present here. Defendant's attorney in the case at bar never suggested to the jury Viveros would testify at trial.

**Brady Violation**

To establish a violation of Brady v. Maryland, 373 U.S. 83 (1963), a defendant must demonstrate (1) the prosecution suppressed evidence, (2) the evidence was favorable to defendant, and (3) the evidence was material. [10] Id. at 87. The district court held the government contravened Brady by failing to

---

[10] Evaluation of a Brady claim asserted in a motion for a new trial involves an application of the three elements identified above, and not the five-prong Sinclair test utilized in typical newly discovered evidence claims. See United States v. Robinson, 39 F.3d 1115, 1119 (10th Cir. 1994).

disclose evidence gathered in DEA Agent Garcia's April 7, 1995, interview with Viveros. It is undisputed that prosecutors failed to turn over Garcia's notes and interview summary to the defense until after defendant's trial had concluded. No Brady violation, however, occurred here.

As we noted earlier, the evidence from Garcia's interview with Viveros that was potentially exculpatory to defendant was known to defendant well before the interview. Defendant cited the same information six days before trial in support of her motion for a continuance. The district court is correct that whether a defendant knew or should have known of the existence of exculpatory evidence is irrelevant to the prosecution's obligation to disclose the information. See Banks v. Reynolds, 54 F.3d 1508, 1517 (10th Cir. 1995). "The only relevant inquiry is whether the information was 'exculpatory.'" Id. Nevertheless, a defendant's independent awareness of the exculpatory evidence is critical in determining whether a Brady violation has occurred. If a defendant already has a particular piece of evidence, the prosecution's disclosure of that evidence is considered cumulative, rendering the suppressed evidence immaterial. Id.

IV.

The judgment of the district court is REVERSED and the case is REMANDED with instructions to reinstate defendant's conviction.

-22-

**No. 97-2332,** *United States v. Quintanilla*

**SEYMOUR**, Chief Judge, dissenting.


Ms. Quintanilla filed her Rule 33 motion within seven days, requesting a new trial in the interests of justice. I am thus unable to agree with the majority's determination to resolve the first issue presented on appeal only under the newly discovered evidence standard. Because I would assess the trial court's ruling on the basis of different legal principles and reach a different result, I must respectfully dissent.

As an initial matter, I cannot agree with the majority's general statement that motions for new trial are regarded with disfavor. As one authority has pointed out,

> [t]he trial court has broad powers to grant a new trial if for any reason it concludes that the trial has resulted in a miscarriage of justice. It is said that these motions are not favored, and that new trials are to be granted with caution. There is substantial authority supporting this proposition if the new trial is sought on the ground of newly discovered evidence, but it seems a mistake to extend this proposition to motions for a new trial because of trial errors or other similar grounds. Here the motion should be neither favored nor disfavored, and the question is only what the interest of justice requires.

3 CHARLES A. WRIGHT, FEDERAL PRACTICE & PROCEDURE § 551 (2ed. 1982) (footnote omitted). The case the majority cites for its proposition is in fact one dealing with a request for new trial on the basis of newly discovered evidence.

Moreover, I am unable to agree with the majority's opinion that defendant's initial new trial motion was based solely on the ground of newly discovered evidence and not on the district court's failure to grant a continuance. The initial motion was filed within

seven days after the verdict, thus allowing defendant to seek a new trial in the "interests

of justice." *See* FED.R.CRIM.P. 33. Fairly construed, I believe the substance of that

motion was the harm resulting from the court's failure to grant a continuance. In her

motion, defendant pointed out she was unable to call Viveros as a witness because he was

unavailable to testify due to his invocation of the Fifth Amendment.[1] That situation was

due, of course, to the court's denial of defendant's motion for a continuance. Defendant

recited in the motion the government's evidence linking her to the stash house, pointed

out the government's reliance on this evidence at trial, noted the substance of Viveros'

purported exculpatory testimony, and asserted that his testimony was necessary to afford

her a fair trial. Although the motion recited the standards governing a new trial sought on

the basis of newly discovered evidence, it is clear that the basis of the motion was

defendant's claim that her harm resulted from the unavailability of Viveros' testimony at

her trial, which she asserted "would be powerful evidence of innocence affecting a

---

[1] The majority criticizes defense counsel for failing to call Viveros as a witness at trial after he entered his plea. In so doing, however, the majority fails to acknowledge the prosecution's successful argument at trial that the defense could *not* call Viveros because he would invoke his right to remain silent in front of the jury. *See* rec., vol. VII at 255. [N]either the prosecution nor the defense may call a witness knowing that the witness will assert his Fifth Amendment privilege against self incrimination." *United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983). Moreover, it has been the law in this circuit that "Fifth Amendment protection continues during sentencing even when the defendant has pled guilty to a crime." *United States v. Garcia*, 78 F.3d 1457, 1463 (10th Cir. 1996); *see also Mitchell v. United States*, 119 S. Ct. 1307 (1999). Counsel for defendant and the court thus cannot be faulted for accepting the government's argument below that Viveros could not be called to invoke his Fifth Amendment rights in front of the jury.

criminal defendant's constitutional right to a fair trial and to protect against a miscarriage of justice." Motion for New Trial, rec., vol. II, doc. 185 at 3.

Indeed, defendant's argument in support of her new trial motion mirrors ground II of her motion for a continuance, in which she set out the substance of Viveros' alleged exculpatory testimony and sought a continuance because she would be unable to call him as a witness if she were tried first due to his invocation of his Fifth Amendment rights. *See* Motion for Continuance, rec., vol. II, doc. 164 at 4-6. As in her new trial motion, she argued that her right to a fair trial required providing her the opportunity to present Viveros' testimony. She cited several of the same cases in her new trial motion that she had relied on in her motion for a continuance. *Compare* Motion for Continuance at 4-6 *with* Motion for New Trial at 1-3.

It is also clear that, in granting defendant's motion for a new trial, the trial court *understood* defendant to be asserting error in the denial of a continuance. The court recognized that a new trial could be granted in the interest of justice if the motion were filed within seven days even if the evidence could not be considered newly discovered. *See* Order Granting New Trial, rec., vol. II, doc. 239 at 18-20 (citing to *United States v. Patterson*, 41 F.3d 577 (10th Cir.1994), and *United States v. DiBernardo*, 880 F.2d 1216, 1223 (11th Cir. 1989)). The court explained that defendant's motion to sever had been granted to allow her to call Viveros as a witness, that not until the middle of trial did the government inform the court that Viveros would not testify until after he had been

-3-

sentenced,[2] and that had the court known Viveros would continue to assert his Fifth

Amendment privilege until his sentencing, the court would have granted defendant's

motion for continuance. *See* rec., vol. II, doc. 239 at 21-22. Thus, the court based the

grant of a new trial in part on its conclusion that the continuance had been wrongly denied

and that defendant's ability to present her defense had been prejudiced.

The trial court's citation to *DiBernardo* is significant. There, the court addressed

circumstances very similar to those present in this case with one important exception, the

new trial motion at issue was not filed within seven days of the jury verdict. The trial

judge had granted a new trial to correct what he perceived as his own error in denying a

severance that would have allowed the defendant to present a codefendant's exculpatory

testimony. The court ruled that the newly available exculpatory evidence of a

codefendant was not newly discovered evidence and that the new trial motion was

therefore untimely. *Id.* at 1223-24. The court nonetheless upheld the grant of the new

trial by construing the motion as a petition for relief under 28 U.S.C. § 2255.

We have recognized that *newly available* exculpatory evidence is not "newly

discovered" for purposes of a Rule 33 new trial motion. *See United States v. Muldrow,*

19 F.3d 1332, 1339 (10th Cir. 1994). There we said,

If a former codefendant who originally chose not to testify subsequently

---

[2] The Supreme Court recently held that a defendant retains his right to assert his Fifth Amendment privilege to remain silent at sentencing even though he has pled guilty. *See Mitchell v. United States*, 119 S. Ct. 1307, 1312-14 (1999).

comes forward and offers testimony exculpating a defendant, the evidence is not newly discovered if the defendant was aware of the proposed testimony prior to trial. *See United States v. DiBernardo*, 880 F.2d 1216, 1224-25 (11th Cir. 1989) (newly available exculpatory testimony of codefendant not newly discovered because known to defendant before trial).

Accordingly, in *United States v. Patterson*, 41 F.3d 577 (10th Cir. 1994), a case that involved "newly available" evidence, we did not apply the "new evidence" standard to the district court's grant of new trial motion.[3] In the present case, the trial court's reliance on *Patterson* and *DiBernardo* in its order granting a new trial explains why the court also made clear at the end of the order that it was "unnecessary to discuss Quintanilla's alternative basis for a new trial based on newly discovered evidence." Rec., vol. II, doc. 239 at 30.

As the trial court here recognized, the fact that the evidence is not newly discovered is not a jurisdictional bar to granting the motion in the interest of justice when, as here, it is filed within seven days of the verdict. This court has not hesitated to

---

[3] I am also troubled by the majority's discussion distinguishing *United States v. Patterson*, 41 F.3d 577 (10th Cir. 1994). First, as I discuss above, I cannot agree with the majority's assertion that defendant did not raise her continuance argument in her new trial motion. Second, while the prejudice from the lack of a continuance in *Patterson* resulted from an unfulfilled representation to the jury, that circumstance is not the only one in which the denial of a continuance is prejudicial. *DiBernardo* is one of several cases in which a new trial was sought on the basis that the trial court issued a ruling that prejudiced a defense because it prevented exculpatory testimony from a codefendant. *See e.g., United States v. Wilson*, 116 F.3d 1066, 1084-85 (5th Cir. 1997); *United States v. Ramirez*, 954 F.2d 1035, 1037-38 (5th Cir. 1992). Finally, I cannot agree with the majority's conclusion that Viveros' testimony would have been of little value to defendant. In my view, this assertion invades the province of the trial court by reassessing credibility and reweighing the evidence.

disregard a defendant's designation of a new trial motion as based on newly discovered evidence and to examine and rule on the actual basis for the court's grant of a new trial. *See United States v. Miller*, 869 F.2d 1418, 1421 (10th Cir. 1989). The approach taken in *Miller* is appropriate here.

Finally, I cannot agree with the majority's conclusion that none of Viveros' proposed testimony would have been material to the defense in this case. First, I do not think the circumstances here are so extraordinary as to warrant our reassessment of a ruling to which the authorities agree we owe deference. *See* 3 FEDERAL PRACTICE & PROCEDURE, § 559. We have stated that a trial court's grant of a new trial will not be disturbed on appeal absent a clear abuse of discretion, pointing out that "the trial judge who presided at the trial of the case and later presided at the hearing on the motion for a new trial, had first-hand knowledge of the entire matter and is in a much better position than we, as an appellate court, to judge the merits of the motion." *United States v. Draper*, 762 F.2d 81, 83 (10th Cir. 1985). "Appellate deference makes sense. Circuit judges, reading the dry pages of the record, do not experience the tenor of the testimony at trial. The balance of proof is often close and may hinge on personal evaluations of witness demeanor." *United States v. Alston*, 974 F.2d 1206, 1212 (9th Cir. 1992) (pointing out that until 1984, grants of new trial motions were not even appealable). The majority opinion contradicts the above authority by simply second-guessing the trial court's assessment of the value of Viveros' testimony in the context of this trial on the

-6-

basis of a cold record.

To the extent that we may make an independent assessment of the matter, I disagree with the majority's evaluation. The trial here turned on defendant's credibility, bolstered by evidence from her brother about his contacts with Aleman that turned on the brother's credibility. The government's attack on defendant's credibility and its effort to undermine her assertion that she had been duped by Aleman were based on circumstantial evidence tying her to the conspiracy through phone records of little probative value with respect to her, purported inconsistencies in her story, and the evidence tying her to the stash house. The case was obviously a close one for the jury, as the record reflects that deliberations lasted six to seven hours. After arguing that its evidence tied defendant to the stash house and therefore to the conspiracy, the government is hardly in a position on appeal to contend that Viveros' evidence offering some negation of that connection would have had no value to the defense. As the government so aptly put it at one point during the trial when explaining the relevance of the stash house and its contents to Quintanilla, "This is a conspiracy case, and the coconspirator and named defendant [Viveros] was arrested in this house and living in this house. This is the destination of the lured vehicle. This is what conspiracy is all about." Rec., vol. VIII at 498. Under these circumstances, we must defer to the trial court's assessment of Viveros' credibility and the impact that his testimony would have had on the jury. Viveros was an illegal immigrant who had only been in the United States a few weeks. He insisted throughout

that he had been duped into helping out by the people letting him stay temporarily at the Pico Rivera house at the behest of a friend in Mexico.  With Viveros' testimony that he was duped, the jury might have been more inclined to believe defendant's testimony that she, too, had been duped, and to believe Aleman's own statement that he had in fact duped defendant.  At the very least, Viveros' testimony might have created for the jury a reasonable doubt as to defendant's involvement in the conspiracy.  The district court would not have granted the motion for new trial had it not had concerns about the outcome of this case.  I do not believe the court abused its discretion in determining that the interests of justice supported the new trial.  *See generally DiBernardo*, 880 F.2d 1216.

Accordingly, I would affirm the trial court's grant of a new trial in the interests of justice on the basis of its failure to grant a continuance and the resulting unavailability of Viveros' testimony.  Having done that, I would not reach the *Brady* issue.