**F I L E D**

**UNITED STATES COURT OF APPEALS**

**June 28, 2005**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DAVID JAMES YARBROUGH,

    Defendant-Appellant.

No. 04-4028
(D.C. No. 2:02-CR-673-TC)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL**, **McKAY** and **HENRY**, Circuit Judges.

Defendant-Appellant David James Yarbrough appeals the district court's

decision denying his motion for a new trial, see Fed. R. Crim. P. 33(a), following

a jury's convicting him on seven counts of making false statements in violation of

---

[*]After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This Order and Judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

18 U.S.C. § 1001.[1]  Having jurisdiction to consider this appeal under 28 U.S.C.

§ 1291, we AFFIRM.[2]

## I.      Facts.

The United States Army stores and destroys chemical weapons at the

Deseret Chemical Depot (Depot) near Tooele, Utah.  Within the Depot, there is an

area called the chemical agent munitions demilitarization system (CAMDS),

which "is a research and development facility where . . . tests [are done] to prove

out the processes and the procedures that [will be] use[d] to destroy the chemical

munitions."  The CAMDS facility includes a chemical test facility, where toxic

---

[1]      18 U.S.C. § 1001(a), in relevant part, provides that

whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully –

(1) falsifies, conceals, or covers up by any trick, scheme or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years . . . , or both.

[2]      Both parties' briefs were singularly unhelpful to this court, lacking both clarity and candor.

chemical tests are conducted, and a filter farm, through which air forced from, among other places, the chemical testing facility, is filtered before it is released back into the atmosphere outside the controlled CAMDS buildings.

Depot workers, especially those working in the CAMDS, as well as the general public, are protected from the toxic chemicals being tested, in part, by an automated continuous air monitoring system (ACAMS). That system involves a series of machines, or ACAMS units, that continuously monitor the air for any trace of toxic chemicals. If these units do detect the presence of a toxic chemical, the machines will set off alarms to warn the workers.

The ACAMS's accuracy and reliability is monitored through baseline testing procedures. "A baseline test is a quality assurance system that [CAMDS] ha[s] to make sure that all of the A.C.A.M.S. units, the monitoring systems in a particular facility work together and . . . work the way that they are supposed to work." Baseline testing involves an operator or mechanic injecting a diluted amount of a particular toxic chemical substance into an ACAMS unit and then recording the machine's reading. This is known as an agent or hazard challenge. If the unit is functioning properly, the machine should indicate the presence of the toxic substance the operator injected.

There are three different types of baseline tests. First, when a monitoring system is installed, there is a thirty-day initial baseline test. This case does not involve initial baseline testing.

After the monitoring system is operational, there is continuous baseline testing. To conduct this continuous testing, operators challenge each ACAMS unit daily with a diluted solution of the appropriate toxic chemical. The operator's first injection into a particular machine is known as the first shot. Once the operator makes the injection, he reads the ACAMS unit's digital reading and records it on the log sheets in the logbook kept with that unit. An optimal reading would be 1.0. But a passing score will fall between .75 and 1.25. Such a passing score indicates that the ACAMS unit is functioning properly.

If the first shot passes, it is recorded on the log sheets as a P1 shot and no further action is taken. If the first shot instead fails, it is recorded on the log sheet as an F1 shot, the mechanic adjusts the machine, and records the adjustments he makes in the comments section of the log sheet. Later, the operator fills out a separate form known as a failure report. After making the needed adjustments, the operator injects the machine a second time. This second shot is usually a passing shot,[3] and would be recorded on the log sheet as P2.

---

[3]    On occasion, operators will make more than two shots into a particular unit.

When conducting a continuing baseline test, operators always record the results of the first shot, regardless of whether that first shot produced a passing or a failing score. The first shot is the most important shot because its results indicate how well the machine has functioned during the preceding twenty-four hours between tests.

The test data is collected in three ways. First, operators record the results of their hazard challenges on the log sheets found in a log book kept with each ACAMS unit. Secondly, the units themselves record the results on a strip of paper known as a strip chart. And thirdly, each unit is connected to a computer which collects readings from all the ACAMS machines.

The results of the continuous baseline testing are then collected and analyzed every four weeks. A statistician takes the readings from the log sheets and feeds those into a computer program. The statistician specifically enters the results of each unit's daily first challenge and, "if it failed on the first shot, then [the statistician] would also enter the second passing challenge" for that day. Using that data, the statistician generates a report, known as an INACCMO report. "The INACCMO report primarily looks at the first shot, so in the statistics that are calculated, the second shot is not looked at. It's all based on the first shot." That report is disseminated to the Depot's upper level supervisors, as well as "various [state and federal] regulatory agencies," "the program manager

for chemical demilitarization out of Aberdeen Proving Ground" in Maryland (PMCD), which is the Depot's "higher headquarters, . . . the Center for Disease Control," the Department of Health and Human Services and the Army.

The third type of baseline test, the testing specifically at issue in this case, is a ten-day recertification baseline. Recertification testing is required when an ACAMS unit has not been in operation for a certain amount of time, or when the facility is changing over from operations involving one toxic chemical agent to those involving another chemical agent. Except for its length, recertification baseline tests are conducted the same way that continuous baseline tests are conducted, with daily hazard challenges to each ACAMS unit. The readings are again recorded on the log sheets and, at the end of the ten-day testing period, the readings are fed into the computer program to produce an INACCMO report. The facility cannot begin any new project until the ACAMS passes the recertification test.

Defendant Yarbrough was the "division chief for the monitoring division on the Depot. He was responsible for supervising the technicians in the performance of their duty of maintaining these [air monitoring] systems." Although Yarbrough had held this position for eight or nine years, he was not acting as division chief during the first half of 2002. During Yarbrough's absence, Patti King and another mechanic foreman had taken over Yarbrough's

duties.  Yarbrough resumed his duties as monitoring system chief on June 20, 2002.

At this time, the CAMDS facility was in the process of conducting recertification baseline tests because that facility was changing over to operations involving a new toxic agent.  During May and June 2002, just before Yarbrough returned to his position, the chemical testing facility and filter farm each had failed two recertification baseline tests.  A third failing recertification baseline test on the chemical testing facility had to be stopped because the ACAMS units were not functioning properly.  In light of these previously failed recertification tests, "[e]verybody was on edge . . . . There was a lot of pressure on people."  Upon resuming his duties, Yarbrough met with King and their supervisor, Ray Courmier, to discuss the earlier failed tests.  At that meeting, King suggested taking all the ACAMS units to "the tech shop" and thoroughly cleaning them. Yarbrough rejected that idea.

Yarbrough instead began another recertification baseline test on the filter farm, which ran from June 29 through July 7, 2002.  There are eight ACAMS units in the filter farm.  Four days into that test, Yarbrough brought Statistician Cherice Day some numbers so Day could run a preliminary INACCMO report to see how the recertification test was going.  Instead of bringing Day the log sheets from each unit's log book, however, Yarbrough had the numbers written down in

a black notebook.  He had never before reported challenge numbers to Day in that manner.  Two days later, and six days into the filter farm's recertification test, Yarbrough again gave Day numbers from his black notebook so she could run another preliminary INACCMO report.  That preliminary INACCMO report indicated station 550 was failing.  And if one station failed, the filter farm's entire ACAMS system would fail the recertification test.  In light of this preliminary failing report, Yarbrough told Day they were going to shoot the station 550 unit more frequently to get the unit to pass.  To shoot a unit multiple times, however, required permission from the PCMD.  Although Yarbrough did not have such permission, the data Yarbrough gave Day for the station 550 unit indicated four passing shots on July 5, another four passing shots on July 6, and two passing shots on July 7, 2002.

At the end of the filter farm's recertification test, Yarbrough again brought Day challenge numbers to enter for the official INACCMO report, this time written on his personal worksheets, rather than the log sheets.  Again, Day had never seen the ACAMS data reported in this format.  When Yarbrough brought Day this data, he also suggested that Day not rely on the data she had previously inputted to obtain the two preliminary INACCMO reports because "some of the numbers had changed."  Day verified that indeed some of the reported test results had changed from the information Yarbrough had given her several days earlier.

Day reported these discrepancies to her supervisor because the reading from "an A.C.A.M.S. challenge is what it is" and should never change.

Yarbrough next conducted a recertification baseline on the chemical testing facility that ran from July 15 until July 24, 2002. There are fourteen ACAMS units in that facility. To create the INACCMO report on this recertification test, Statistician Day took data from the log sheets for the first seven days of the test. For the final three days, however, Yarbrough brought Day test data on his own handwritten worksheets. When Day ran the INACCMO report with this data, the units at stations 26, 26D, 120, 569 and 703 failed. Yarbrough then told Day "to go back and make [all] the data match his personal sheets and run the INACCMO report again." When Day did this, she again noted that "some of the numbers were different, and there were first challenge failures that had been omitted." Using Yarbrough's data, all the stations passed. Yarbrough then told Day "that this was the data that we needed to send to P.M.C.D. . . ., and that we didn't have any other choice because this was the one that passed." Based upon Yarbrough's directions, Day distributed this passing INACCMO report to the relevant Depot and Army supervisors.

Day reported these discrepancies to her supervisor, resulting in an investigation. As part of that investigation, Day ran a new INACCMO report using data from the strip chart created by the unit at station 550. That report

indicated that station 550 had failed the recertification test. And when Day re-ran the INACCMO report using data recorded by the computer to which these ACAMS units were connected, the report indicated that only four of the fourteen units in the chemical testing facility had actually passed the recertification test. The week after this recertification test ended, Yarbrough asked Day to return his personal worksheets because "it would be very hard to explain because some of the numbers did not match."

The investigation further disclosed that, in his own notes from which he took the data for the official INACCMO report, Yarbrough had at times recorded only passing challenges, while omitting first-shot failures. In addition, on other occasions, Yarbrough had used completely different numbers than the numbers operators had recorded on the log sheets. And there were several instances where someone appeared to have changed failing numbers on the log sheets to passing numbers.

In his defense, Yarbrough asserted that the relevant regulations did not require him to use the first-shot results when conducting recertification, as opposed to continuing, baseline tests. Those regulations for conducting baseline testing are contained in the Laboratory Quality Assurance Plan (LQAP), which "is the quality control program that [the Depot] use[s] for the monitoring system;" it "governs how [the CAMDS] conduct[s] a baseline." The December 2001 LQAP

specified that for a recertification test, there had to be a "daily challenge" within the .75 to 1.25 range.[4] Yarbrough testified that he interpreted this language only to require him to obtain and record a passing score on each machine sometime during each day and did not require him to use the first-shot results, as he would have had to do when conducting a continuous baseline test.

Others disagreed with Yarbrough's interpretation of the LQAP's requirements for a recertification test. For example, Patti King, who had conducted the previously unsuccessful recertification tests in May and June 2002, testified the monitoring department had always interpreted the LQAP to require recording the first shot's results, regardless of whether it was a passing or failing score. According to King, that interpretation was part of the Depot's quality control plan. And King further testified that it would not make any "sense at all" for an operator simply to inject the ACAMS unit repeatedly until she obtained a passing score and then record only the passing score. In that case, the ACAMS would always pass any recertification test. Statistician Cherice Day, too, testified that omitting failed first shots when producing the INACCMO report "would give misleading results because if you only put in the passing challenges, then it's going to look like the A.C.A.M.S. is functioning properly, which in fact it's not,

---

[4]     We rely solely on the trial transcript for this information. Yarbrough has not provided this court with any exhibits, including any portions of any LQAP.

and that's what [the INACCMO report] calculates is the rate basically of the failures."

Further, there was significant evidence from which the jury could have inferred that Yarbrough's interpretation of the LQAP was only a post hoc justification for his intentionally falsifying this data to insure that the ACAMS passed the recertification baselines. For example, King testified that she had participated in seven or eight recertification baseline tests, including previous tests Yarbrough had conducted, and that the operators had always recorded the first challenge's results and used that number to calculate the recertification test's INACCMO report. And Yarbrough himself acknowledged that the facility had never before conducted a recertification test by omitting first-shot failures. "We had never had a reason to use" the different reporting regulations for a recertification baseline. "Whenever I did a recertification baseline before, it passed both requirements."

In addition, despite Yarbrough's assertion that the LQAP did not require him to include the first-shot failures, sometimes he did include those results in his own notes. Further, there was evidence that, not only did Yarbrough omit failing first shots from his data, as he asserted the LQAP permitted him to do, but much more often he simply used completely different passing numbers not found anywhere in the relevant log sheets.

When Depot officials began investigating the July recertification tests, they also discovered that a majority of the relevant log sheets, strip charts, and failure reports for this time period were missing. Some computer reports were missing, too. There had never before been any instance of these documents disappearing.

Moreover, when confronted with the apparent discrepancies in the testing data, Yarbrough never told anyone that the LQAP permitted him to omit the first-shot failures. Instead, he asserted that, while he had included different numbers on his own personal worksheets, he had never used those numbers on any official reports, when in fact he had done so. Finally, Yarbrough admitted to an investigator that he had "change[d] the data" concerning stations 26D and 550. Yarbrough acknowledged that "he knew the data had failed. He put passing numbers where failing numbers were, and he admitted he did this just to make the baseline pass." Yarbrough then told the investigator, "'Since I admitted to the one, what's the point in going through all of them?'" The next day, Yarbrough helped draft and then signed a written statement attesting to these admissions.

The jury convicted Yarbrough of seven counts of making false statements, involving the ACAMS units for stations 26, 26D, 120, 567, 703, 550 and the INACCMO report indicating the ACAMS for the chemical testing facility had passed the recertification test; and acquitted him on one count involving the unit at station 570. The district court denied Yarbrough's motion for a new trial and

sentenced Yarbrough to six months' imprisonment, followed by three years' supervised release. Yarbrough appeals, challenging the district court's decision to deny him a new trial.

## II.   ISSUES

Generally, this court reviews the "denial of a motion for a new trial in a criminal case . . . for an abuse of discretion." United States v. Higgins, 282 F.3d 1261, 1278 (10th Cir. 2002). Where a new trial motion turns on a question of law, however, we will review the district court's decision de novo. See United States v. Ailsworth, 138 F.3d 843, 846 (10th Cir. 1998).

"Rule 33 of the Federal Rules of Criminal Procedure authorizes a district court to grant a new trial if required in the interests of justice." Higgins, 282 F.3d at 1278. "Motions for new trial are disfavored, however, and granted only with great caution." United States v. Mounkes, 204 F.3d 1024, 1027-28 (10th Cir. 2000).

### A.   Ineffective trial representation.

Yarbrough argues he was entitled to a new trial because his trial attorney provided ineffective representation. Specifically, Yarbrough challenges his trial attorney's decision not to call Randy Johnson to testify as a defense witness.[5]

---

[5]   In his new trial motion, Yarbrough challenged his attorney's representation for numerous other reasons. This is the only ineffective-assistance

(continued...)

- 14 -

Ordinarily, we will not consider ineffective-assistance claims raised on direct appeal. See Massaro v. United States, 538 U.S. 500, 504-05 (2003); United States v. Galloway, 56 F.3d 1239, 1240 (10th Cir. 1995) (reh'g en banc). This is because there will often be a need for a record to be developed beyond the trial, see Massaro, 538 U.S. at 504-05, and because "we benefit from the views of the district court regarding such claims," United States v. Edgar, 348 F.3d 867, 869 (10th Cir. 2003). In this case, however, the district court already addressed Yarbrough's ineffective-assistance claims. This, then, is one of those rare cases where we will consider a defendant's ineffective-assistance claim on direct appeal. See United States v. Montoan-Herrera, 351 F.3d 462, 465 (10th Cir. 2003).

To be entitled to relief, Yarbrough must establish both that his counsel's performance was deficient and that that deficiency prejudiced Yarbrough's defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984). Yarbrough asserts defense counsel should have called Randy Johnson, a monitoring mechanic, who would have testified that Yarbrough's interpretation of the LQAP was correct and that Yarbrough could properly omit failing test results from his recertification data. Yarbrough's defense attorney asserted in an affidavit that he

---

[5](...continued)
claim, however, that he reasserts on appeal.

- 15 -

had originally intended to call Johnson, but decided not to do so because Johnson's testimony would have been irrelevant or cumulative. Defense counsel further asserted Johnson never told him about Johnson's interpretation of the LQAP. For the first time in his reply brief to this court, Yarbrough vaguely asserts that his defense attorney failed to interview Johnson diligently before deciding not to call him as a witness.

We need not address whether defense counsel's performance was deficient because we conclude counsel's failing to call Johnson to testify did not prejudice his defense. See id. at 697. To establish prejudice, Johnson must show that, had defense counsel called Johnson to testify, there is a reasonable probability that the jury would have acquitted Yarbrough. See id. at 695. But even with Johnson's testimony supporting Yarbrough's interpretation of the LQAP, there was still significant evidence indicating that Yarbrough was not actually acting upon that interpretation when he changed challenge numbers to insure the filter farm's and chemical testing facility's ACAMS passed the recertification tests, nor do we believe there is a reasonable probability that the jury would have acquitted Yarbrough if it had heard this testimony. The district court, therefore, did not abuse its discretion in denying Yarbrough a new trial on this basis.

**B.    Newly discovered evidence Patti King testified falsely.**

Yarbrough argues that he is entitled to a new trial in light of newly discovered evidence that Patti King's testimony, that there was a newer version of the LQAP than the December 2001 version upon which Yarbrough was relying, was false.[6]

> A five-part test must be applied in determining whether this "newly discovered evidence" warrants a new trial.  Defendant must show (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

Higgins, 282 F.3d at 1278 (quotation omitted).  Here, assuming Yarbrough can meet the other four requirements, he is not entitled to relief because his newly discovered evidence is not "of such a nature that in a new trial it would probably produce an acquittal."  Id. (quotation omitted).

---

[6]    Despite being aware that there was not a later LQAP version, Yarbrough never specifically requested that the district court grant him a new trial on this basis.  Yarbrough only mentioned King's false testimony in his memorandum filed just before the district court's post-trial evidentiary hearing on an alleged sequestration order violation.  Arguably, then, Yarbrough has waived this argument.  See United States v. Humphrey, 208 F.3d 1190, 1200 (10th Cir. 2000).  Nonetheless, because the district court appears to have addressed King's testimony when the court denied Yarbrough a new trial, we too will address this claim's merit.  In doing so, we note that Fed. R. Crim. P. Rule 33(b)(1) permits a defendant to assert a new trial claim such as this one, alleging newly discovered evidence, within three years from the jury's verdict.  Therefore, Yarbrough's claim challenging King's testimony was not untimely under Rule 33.

Yarbrough's defense was, in part, that he interpreted the December 2001 LQAP to permit him to omit first-shot failures when he was conducting a recertification test. King testified, instead, that one always had to include all first-shot failures, even when conducting a recertification test. King's testimony also suggested there was a newer version of the LQAP that supported her interpretation. Nonetheless, King's testimony on this point was confusing and also suggested she was in fact referring to the same December 2001 LQAP upon which Yarbrough was relying.

Q  Are you familiar with table six in the L.Q.A.P. regulations?

A  What reg are you reading from?

Q  Table six in the December 2001 regulations.

A  That's an old one, yeah.

Q  But it was in effect in 2002; is that correct?

A  We have a new one.

Q  I know, but in June of 2002, the December 2001 regulation was in effect?

A  No, we have a new one.

Q  And when was the new one enacted?

A  Over a year ago – over two years ago [from the trial date, July 2003,] because I went back to the – to review it.

Q  Well, if in December 2001 we have this particular table six, are you saying that between then and June of 2002 it was changed?

A No. They're all the same on how you do a baseline and have been for years.

. . . .

Q So there is a new table out there somewhere that says somewhere – and it's a table six, it's the same table that's --

A No. It's rewritten. Instead of having one book now, we have two books. There's a user guide and also a – just another guide, and it's in the L.Q.A.P.

Q And do you know whether Mr. Yarbrough when he came back to work [in June 2002,] had a copy of this new – the new stuff?

A Yes, he did.

Q Did you see that? Did you see him in possession of that?

A Yes.

Q And when did you see him with those documents?

A They were in his office.
. . . .

Q And to your knowledge . . . .[the LQAP was] modified or amended sometime in 2002?

A No. I . . . believe we got a new one over a year ago, so --

Q 2001?

A Yeah, I do believe.

Q Does that –

A 2002 – maybe it's 2002. Anyway, we've got – I think we get a new one every year.

- 19 -

Q And that one [that the witness had been reviewing] does indicate that it was in effect in December of 2001; is that correct?

A That's correct.

During her testimony, King did eventually agree with defense counsel that the LQAP's table six did not specifically state that Yarbrough had to include first-shot failures – "it doesn't say not first challenge, so we assume – and talking to the guys that wrote this, which I have talked personally to, you go by the first challenge."

King's testimony, then, was confusing. After a post-trial evidentiary hearing, the district court found that King's testimony had been mistaken, but not intentionally false. At trial, no other witness testified that there was a newer LQAP than the December 2001 version. Nor did anyone testify that there was a version that explicitly required Yarbrough to include the first-shot challenges when conducting a recertification test. Other government witnesses, like King, testified that they had always included the first-shot failures when conducting recertification tests. Yarbrough acknowledged that this was true. His defense was that, at the time he conducted the recertification tests at issue in this case, he interpreted the LQAP to permit him to omit first-shot failures. As outlined above, there was significant evidence from which the jury could have inferred that Yarbrough's interpretation of the LQAP was only a post hoc justification for his

using false numbers in his reports to insure the ACAMS passed and that, at the time he was conducting the recertification tests at issue here, he was actually not acting pursuant to his later asserted interpretation of the LQAP.  In light of that significant evidence, Yarbrough's newly discovered evidence, that there was no version of the LQAP newer than December 2001, was not evidence "of such a nature that in a new trial it would probably produce an acquittal."  Higgins, 282 F.3d at 1278 (quotation omitted).

### C.    Improper prosecutorial argument.

Yarbrough asserted he was entitled to a new trial in light of the prosecutor's improper closing argument.  We review the district court's decision to deny Yarbrough a new trial based upon the prosecutor's improper argument only for an abuse of discretion.  See United States v. Gabaldon, 91 F.3d 91, 93 & n. 1, 94 (10th Cir. 1996).

Yarbrough asserts that "the prosecuting attorneys misrepresented to the jury in closing argument that Mr. Yarbrough had written down his data numbers on his data sheet moments before taking the sheets over to the statistician for input, implying clearly, and falsely, without any basis in evidence in the record, that the numbers were fabricated on the spot and were not real valid results of ACAMS challenges."  Specifically, the prosecutor argued

> Ladies and gentlemen of the jury, if you had been in the
> monitoring shop on the C.A.M.D.S. site on the morning of July 3 of

2002, you'd have seen David Yarbrough finishing entries into that black book that he was finishing up completing just before he walked those numbers over to Cherice Day to ask her to give him a health report on the beginning of his baseline.

. . . .

Again, if you'd been in David Yarbrough's office on the 24th of July, you'd have seen him with his personal sheets making entries – making entries onto his personal sheets before he crossed the yard and again presented his personal sheets to Cherice Day to get an INACCMO report done on the [chemical testing facility] baseline.

As set forth above, there was evidence to support the prosecutor's argument that Yarbrough made up some of the numbers he gave to Statistician Day. The question of when Yarbrough made up those numbers, right before he gave them to the statistician or much earlier, was not pertinent to the criminal charges against Yarbrough. The prosecutor's argument, then, did not deprive Yarbrough of a fair trial. See Gabaldon, 91 F.3d at 95.

Yarbrough also challenges the prosecutor's telling jurors they should ignore the LQAP altogether; referring to operators' testimony that was never given; misrepresenting the incriminating statement Yarbrough gave the investigator as a "confession 'to providing false information;'" eliciting "misleading testimony about chain of custody and formal data handling procedures;" and misrepresenting that "Yarbrough instructed Harold Park to have the operators write down his first shot if it passed and not to use it if it failed." Yarbrough did not raise these

claims initially in his new trial motion, but instead later asserted them in his memorandum filed with the district court just before the district court conducted a post-trial evidentiary hearing, almost four months after the jury's verdict. Because these claims are not based upon allegations of newly discovered evidence, however, Rule 33(b)(2) required Yarbrough to raise them within seven days of the jury's verdict. He did not do so. And this seven-day time frame is jurisdictional. See United States v. Quintanilla, 193 F.3d 1139, 1148 (10th Cir. 1999). Yarbrough cannot circumvent this jurisdictional time limit by later trying to amend his new trial motion to add these other claims. See id. Therefore, the district court lacked jurisdiction to consider these other claims alleging prosecutorial misconduct. And we will not consider these claims now.[7]

**D.    Sequestration order violation.**

In a single sentence in his brief, Yarbrough vaguely asserts, without any further explanation, that "a key Government witness violated the district court's sequestration order and spoke with other Government witnesses." We will not consider such an inadequately briefed issue. See Gross v. Burgraff Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995); see also United States v. Kravchuk, 335 F.3d 1147, 1153 (10th Cir.), cert. denied, 540 U.S. 941 (2003).

---

[7]    Even if we did consider these claims' merits, however, we are satisfied none of these allegations of prosecutorial misconduct, considered separately or together, were sufficient to warrant relief.

**III.    Conclusion.**

For these reasons, we AFFIRM Yarbrough's convictions.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge