PUBLISH

**December 11, 2008**

UNITED STATES COURT OF APPEALS

**Elisabeth A. Shumaker**
Clerk of Court

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STAN TARAN FORD,

Defendant-Appellant.

No. 07-1176

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 05-CR-537-REB)**

---

Jill M. Wichlens, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, with her on the briefs) Office of the Federal Public Defender, Denver, Colorado.

Andrew A. Vogt, Assistant United States Attorney, (Troy A. Eid, United States Attorney, with him on the brief) Office of the United States Attorney, Denver, Colorado.

---

Before **TYMKOVICH**, **GORSUCH**, Circuit Judges, and **PARKER**, Senior District Judge.[*]

---

**TYMKOVICH**, Circuit Judge.

---

[*] Hon. James A. Parker, Senior U.S. District Court Judge, District of New Mexico, sitting by designation.

Stan Taran Ford was convicted for illegally selling or possessing a machine gun. Ford's primary defense at trial was entrapment. After he was convicted, Ford alleged the government failed to produce multiple emails sent between him and the informant. The district court found that three undisclosed emails existed, but denied a post-trial motion to set aside the conviction, concluding that these emails would not have affected the outcome of the trial. We agree with the district court that in light of all the evidence presented at trial, the emails were not sufficiently material to cast doubt on the jury's verdict.

Having jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM the district court's judgment.

## I. Background

*Factual Background*

Colorado's Joint Terrorism Task Force (JTTF)[1] obtained a tip in late 2003 from Ford's co-worker Jimmy Hee that Ford was trafficking in automatic weapons and engaging in other suspicious activity. According to the tip, Ford, a Denver firefighter, owned illegal fully-automatic firearms and was attempting to procure sensitive military communications equipment. Ford also allegedly asked Hee

---

[1] The JTTF is a law enforcement task force comprised of the FBI and other federal, state, and local law enforcement agencies that investigate crimes involving international and domestic terrorism.

about a NATO conference in Colorado Springs and a planned visit by Secretary of Defense Donald Rumsfeld to Fort Carson.

As part of their investigation, the JTTF recruited Keith Heavilin to work as an informant. Heavilin had previously worked as an informant in several other JTTF investigations. Prior to working on this case, Heavilin had also served in the military for twenty-one years and was employed by the security division of the U.S. Department of Energy for sixteen years.

In February 2004, Heavilin struck up a conversation with Ford at a gun show in Denver, where Ford was an exhibitor. Ford soon perceived Heavilin to be a friend. Over the next year and a half, they had over 100 contacts with each other via phone, email, and in person.

During this time, Ford sold Heavilin three machine guns. The first transaction occurred on April 22, 2005, when Ford sold Heavilin a Sten machine gun. The next transaction occurred several months later, on August 2, 2005, when Ford sold Heavilin a H&K machine gun. Finally, on November 21, 2005, Ford sold Heavilin a fully automatic AR-15 machine gun.[2]

---

[2] In the record, the parties and witnesses also refer to this weapon as an Olympic Arms machine gun.

*Pretrial Proceedings*

Ford was charged with three counts of knowingly transferring or possessing a machine gun, in violation of 18 U.S.C. § 922(o).[3] The three counts were based on the April 22, August 2, and November 21 machine gun sales.

Before trial, Ford filed a motion to obtain the government's case files pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). During a hearing on this motion, Ford specifically requested any emails between Heavilin and himself. Ford did not have access to the emails because the government seized his computer when he was arrested. Although the government produced several emails, Ford told the court he believed more emails existed, and this evidence would support his defense. The government responded by stating it was not aware of any additional emails, but it agreed to recheck its records. The prosecution did not provide Ford any additional emails prior to trial.

---

[3] He was also indicted on one count of knowingly possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). This charge is not relevant to the present appeal; the jury acquitted him on this count.

*Entrapment Defense at Trial*

At trial, Ford did not deny he sold Heavilin the three machine guns. Instead he argued he had been entrapped by the government.

In support of the entrapment defense, Ford argued Heavilin continuously pressured him over a long period of time to acquire and sell the three machine guns—crimes Ford was otherwise unwilling to commit. In particular, Ford's counsel highlighted the substantial number of contacts Heavilin initiated with Ford. The attorney summarized these contacts in a spreadsheet presented to the jury, and repeatedly referred to them during trial. For example, in his closing argument counsel stated the following:

> This is the exhibit that you have seen, at least the first page, you have seen it a lot. *But what you need to focus on for a minute is the sheer number of contacts initiated by Keith Heavilin. . . .*
>
> And what is he calling all of these times to do? He is calling all of these times to persuade and talk a man into selling him a gun who told him, no, I don't sell automatic weapons, I thought you were talking about a semiautomatic weapon, I can't help you. *That is call after call, meeting after meeting, for one purpose only; to make him think you are a friend, and to persuade or talk him into selling you an automatic weapon.*

R., Vol. XV at 1832–33 (emphasis added). As counsel explained, "This exhibit is a roadmap for entrapment." *Id.* at 1835.

*Chronology*

During the trial, both the prosecution and the defense highlighted the substantial interactions between Ford and Heavilin. From the time they first met on February 7, 2004, to the time of Ford's arrest, the two communicated by phone, email or in person over one hundred times. Up to the first machine gun sale on April 22, 2005, Heavilin and Ford communicated fifty-nine times. Then, between the April 22 and August 2 transactions, they communicated another twenty-five times. Finally, between the August 2 and November 21 sales, they communicated nineteen times. Most of these communications were by telephone, although they met in person thirteen times and sent seventeen emails.

The following is a chronology describing interactions that occurred after the second sale.[4] The bold text reflects information contained in the missing emails. The remaining text is based on the trial record.

| 8/14/2005 | Ford emails Heavilin. |
| 9/21/2005 | Heavilin calls Ford, and Ford calls him back seven hours later. Ford tells Heavilin he is worried about something related to the gun show. Ford repeatedly tells Heavilin "I played by the rules a hundred percent, I haven't done anything wrong." R., Vol. IX at 165.[5] |

---

[4] For the dates August 14, October 5, October 13, and October 17, the only information available to the jury was the existence of the contacts. The trial record does not contain information regarding what was said or written.

[5] Additionally, a recording of the conversation was played at trial.

| Unspecified time before 10/5/2005 | **First missing email: Heavilin emails Ford and asks him about a third machine gun.** |
|---|---|
| 10/5/2005 | Ford sends the following reply to Heavilin[6]:<br><br>Just returned from out of town. Social sounds good. I'll call you and set something up over next couple of days. Not any good computer[7] deals out there right now. I think rising costs are to blame. Just keep watching the big store ad's [sic] for a sale.<br><br>Should be able to call in the next couple of days.<br><br>R., Vol. I, Doc. 179 at 16; *see also* Aplt. Addendum, Exhibit 1. |
| 10/13/2005 | Heavilin calls Ford. |
| 10/17/2005 | Heavilin calls Ford three times on the same day. |
| 10/18/2005 | Ford calls Heavilin and Heavilin calls him back. They decide to meet at the Rocky Flats Lounge. At the Lounge, Heavilin tells Ford the second machine gun he purchased had too much kick and he wanted a smaller caliber gun. He explains he has the money and would like the machine gun in two weeks. Ford responds by saying he has not heard of anything being available, but something might come up around Christmas because someone might be in need of cash. |

---

[6] Both Ford and the government state the text of this email was available to the jury, but do not cite to the trial record to show where it was discussed or admitted. Instead the parties merely cite an exhibit Ford submitted with his motion for a new trial. *See* R., Vol. I, 179 at 16.

[7] *Computer* was Ford and Heavilin's code word for machine gun.

| | |
|---|---|
| **Unspecified time between 10/18/2005 and 10/28/2005** | **Second missing email: Heavilin emails Ford and asks him to locate and sell him a third machine gun.** |
| **10/28/2005** | **Third missing email**: **Ford sends the following reply to Heavilin's email:** |
| | **nothing at this time.  I don't expect to find a special on a computer this close to christmas [sic].  Too much demand for a good sale.  Just keep watching the newspaper ad's [sic].  I am still watching.** |
| | **R., Vol. I, Doc. 196, at 14.** |
| 11/17/2005 | Heavilin calls Ford and asks him "what's the word."  Aplt. Addendum, Exhibit 2.  Ford replies that nothing is available.  Heavilin tells Ford he knows someone in Colorado Springs but prefers to deal with only Ford.  Ford suggests he ask the person in Colorado Springs.  Heavilin tells Ford to keep in touch and let him know if anything becomes available. |
| 11/19/2005 | Ford calls Heavilin twice.  Heavilin tells Ford that he will call him back.  Twenty minutes later, Heavilin calls Ford, and Ford says a machine gun became available. |
| 11/21/2005 | Heavilin calls Ford and Ford calls him back.  Heavilin meets Ford at a predetermined location and Ford gives him a decoy gun.  Once Ford is sure that no police are monitoring the transaction, they meet again at a different location.  Ford gives Heavilin the machine gun in exchange for $5,400 in cash. |

After Ford and Heavilin completed the last transaction, law enforcement officers arrested Ford early the next day.

The jury's verdict was split—acquitting Ford on the April 22 and August 2 transactions and convicting him based on the weapon sold or possessed on November 21, 2005.

*Post-trial Proceedings*

Ford subsequently filed a motion for a new trial, alleging the government violated *Brady* by withholding evidence material to his entrapment defense. In particular, he alleged the government withheld emails sent by Heavilin "that were exculpatory in that they would have provided documentary evidence to support [Ford's] assertion that he was subject [to] government entrapment when he sold the third fully automatic weapon to [Heavilin]." R., Vol. I, Doc. 173 at 2, ¶ 2.

The government responded by stating it was not aware of any undisclosed emails. The district court agreed to hold an evidentiary hearing regarding the matter.

Prior to the hearing, Ford served a subpoena on Heavilin's email provider, Yahoo, to determine whether any undisclosed emails could be recovered. Yahoo discovered a single email. This previously undisclosed email was sent by Ford to Heavilin on October 28, 2005. In the email, Ford tells Heavilin no "computer" was currently available for sale.[8]

---

[8] *See supra* note 8.

During the hearing, Heavilin explained that when he received an email from Ford, he forwarded it to Donald Estep. Estep was a Jefferson County deputy sheriff and he assisted the JTTF with the investigation. After Heavilin forwarded an email, he then deleted it from his Yahoo account.

With regards to the missing October 28 email, Heavilin explained Estep was out of the office when this email arrived; Estep was either on vacation or attending classes. Heavilin placed the email in the hold box of his Yahoo account. Presumably, he planned to forward the email to Estep when he returned to work. Heavilin testified he nonetheless forgot about the email and never forwarded it. He believed this email was the only message he forgot to send to Estep.[9]

In reviewing the evidence presented at the hearing, the district court nonetheless concluded two additional emails existed. The first email would have been sent by Heavilin sometime prior to October 5. In the email, the court concluded Heavilin asked Ford to sell him a third machine gun. The second email was sent sometime between October 18 and October 28, and likely spurred Ford's

_____

[9] The government agreed at oral argument that entrusting evidence preservation to an informant is improper procedure. That error was compounded in this case by the failure to make timely access to the computer hard drives the government held after it arrested Ford.

-11-

October 28 response. In this email, the court concluded again that Heavilin asked Ford to sell him a third machine gun.

Even though the district court concluded the government withheld three emails, the court decided no *Brady* violation occurred. It concluded the undisclosed emails were merely cumulative to the substantial number of other contacts between Ford and Heavilin and would not have made a difference if presented at trial. The court therefore denied Ford's motion for a new trial.

## II. Discussion

The Due Process Clause of the Fifth Amendment requires the prosecution to disclose all evidence that favors the defendant and "is material either to guilt or to punishment." *United States v. Robinson*, 39 F.3d 1115, 1118 (10th Cir. 1994) (quoting *Brady*, 373 U.S. at 87). This duty extends to investigators assisting the prosecution. *See United States v. Velarde*, 485 F.3d 553, 559 (10th Cir. 2007).

Accordingly, a defendant may base a *Brady* claim on an investigator's alleged failure to disclose material evidence, even when the prosecutor did not know of the evidence. *Id.* Because Ford is alleging a *Brady* violation, we review de novo the district court's denial of his motion for a new trial. *Id.* at 558 (citing *United States v. Pearl*, 324 F.3d 1210, 1215 (10th Cir. 2003)).

A defendant who seeks a new trial based on an alleged *Brady* violation must show by a preponderance of the evidence that "(1) the prosecution

suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *Id.* at 558 (quoting *United States v. Quintanilla*, 193 F.3d 1139, 1149 & n.10 (10th Cir.1999)). For the evidence to be material, there must be "a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (internal quotation omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

In this case, we must decide whether the undisclosed evidence was material to Ford's entrapment defense. The government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped. *United States v. Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005). The government entraps a defendant when (1) it induces the defendant to commit the offense, and (2) the defendant is not predisposed to commit the offense. *Id.*; *see also* Jury Instruction No. 22, Aplt. Reply Br., Attach. 1. Even though the government has the burden of proving the defendant was not entrapped, both "elements [are] required to find entrapment." *United States v. Young*, 954 F.2d 614, 616 (10th Cir. 1992). While "[t]he two elements of entrapment are closely related and often the same evidence

and arguments will speak to both elements," *id.*, if the government disproves either element then the entrapment defense will fail.

Under the first element, the government induces the defendant when it engages in "conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *Nguyen*, 413 F.3d at 1178. "Simple evidence that a government agent solicited, requested, or approached the defendant to engage in criminal conduct, standing alone, is insufficient to constitute inducement." *Id.* (internal quotation marks omitted). Under the second element, predisposition exists if the defendant has an "inclination to engage in the illegal activity for which he has been charged, i.e., that he is ready and willing to commit the crime." *Id.*

Even if a defendant was entrapped in one transaction, we do not automatically assume all subsequent transactions between the government agent and defendant are tainted. We have "explicitly refused to adopt as a general rule that once entrapment occurs, a defendant's subsequent willing acts are immunized from culpability." *Id.* at 1180 (internal quotation marks omitted).

Although the government did not produce three emails favorable to Ford's entrapment defense, we agree with the district court that the evidence did not meet the materiality element required for a new trial.

**A.** ***The Government Failed to Disclose Favorable Evidence***

To establish a *Brady* violation, the defendant must first show the government failed to disclose favorable evidence. The defendant does not have to establish bad faith.[10] *United States v. Hernandez-Muniz*, 170 F.3d 1007, 1010–11 (10th Cir. 1999).

*The Early October Email*

The existence of the first missing email is based on a responsive email Ford sent on October 5, 2005. In this email, Ford stated the following:

> Just returned from out of town. Social sounds good. I'll call you and set something up over next couple of days. Not any good computer deals out there right now. I think rising costs are to blame. Just keep watching the big store ad's [sic] for a sale.
>
> Should be able to call in the next couple of days.

R., Vol. I, Doc. 179 at 16. The district court concluded from this text that Ford was replying to an email previously sent by Heavilin asking if any more machine guns were available. The existence of the email is also reinforced by the transcript of an October 18, 2005 telephone conversation between Ford and Heavilin. In this conversation, Heavilin indicated he had earlier sent Ford an email message about purchasing a third machine gun. Heavilin told Ford, "And that's kind of why I emailed and said give me a clue." R., Vol. I, Doc. 196 at 9.

---

[10] On this record, no one points to bad faith by the government.

The district court also properly concluded the email supported Ford's entrapment defense because it established an additional contact initiated by a government informant. This additional contact, therefore, supports Ford's theory that the government's persistence is the reason he committed the crime.

*The Late October Emails*

Ford obtained the undisclosed October 28 email from Heavilin's Yahoo account. In the email, Ford told Heavilin:

> nothing at this time. I don't expect to find a special on a computer this close to christmas [sic]. Too much demand for a good sale. Just keep watching the newspaper ad's [sic]. I am still watching.

R., Vol. I, Doc. 196, at 14. Based on the text of this email, the district court convincingly concluded that an earlier email must have existed in which Heavilin asked Ford if any machine guns were currently available.

The district court also properly concluded both emails would have been favorable to Ford's defense because they further supported his argument that Heavilin's persistence was the reason Ford committed the crime.

**B.** *The Undisclosed Emails Were Not Material*

For the evidence to be material, there must be "a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler*, 527 U.S. at 289 (1999) (internal quotation omitted). When reviewing materiality for *Brady* purposes, we are mindful of the Supreme Court's admonition not to look for "ample, independent evidence of guilt" or "evidence sufficient to support the [jury's] findings." *Strickler*, 527 U.S. at 290. Rather, we look to whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. *accord Strickler*, 572 U.S. at 290; *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir. 1995).

**1.**

In attempting to prove entrapment, the defendant's central piece of evidence was an exhibit highlighting the number of times Heavilin contacted Ford. As the defense explained in closing,

> This is the exhibit that you have seen, at least the first page, you have seen it a lot. But what you need to focus on for a minute is the sheer number of contacts initiated by Keith Heavilin. . . . That is call after call, meeting after meeting, for one purpose only; to make him think you are a friend, and to persuade or talk him into selling you an automatic weapon.

R., Vol. XV at 1832–33.

-17-

The exhibit showed over a hundred contacts between Ford and Heavilin during the course of their dealings. From the first contact at the gun show to the first machine gun transaction, Heavilin initiated contact with Ford forty-three times, with a total of fifty-nine contacts. Between the first and second transaction, Heavilin initiated contact eighteen times, for a total of twenty-five communications.

Between the second and third sale, the exhibit identified twelve more contacts initiated by Heavilin, with a total of nineteen interactions. If the missing emails had been disclosed to the defense, the exhibit could have shown two additional contacts initiated by Heavilin, and one more by Ford.[11]

We agree with the district court there was not a reasonable probability that this additional evidence would have changed the outcome of the trial, especially in light of the strong evidence undermining Ford's entrapment defense for the third sale. Based on a holistic review of the evidence, we are confident the jury would not have reached a different result if the government had satisfied its *Brady* obligations.[12]

---

[11] We note the jury could have concluded the existence of the early October email because Heavilin mentioned it in the October 18 conversation, which the jury heard a recording of. *See supra* Part II.A.

[12] Although the dissent contends we shortchanged some of the evidence offered by the defense, we have conducted a review of the entire record, considered all of the evidence—including every portion of the record highlighted

(continued...)

Ford's entrapment defense required the jury to determine if Ford was predisposed towards possessing or transferring the weapon in question. "The defendant's lack of [] predisposition is the crux of the entrapment defense." *United States v. Fadel*, 844 F.2d 1425, 1429 (10th Cir. 1988). Predisposition is the "defendant's inclination to engage in the illegal activity for which he has been charged." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986). Predisposition may be inferred from the "defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's . . . offer, or his demonstrated knowledge or experience in the criminal activity under investigation." *United States v. Mendoza-Salgado*, 964 F.2d 993, 1002–03 (10th Cir. 1992) (internal quotation omitted).

For the following five reasons, we conclude the suppressed evidence does not cast sufficient doubt on the outcome to be material for *Brady* purposes. Evidence before the jury demonstrates Ford was predisposed toward possessing or transferring the fully automatic AR-15 machine gun. The suppressed evidence simply does not undermine the probability of the jury's conclusion, and thus cannot be found material in this case.

---

[12](...continued)
by the dissent—not in isolation but as a whole. We focus on the cited evidence in large part because this evidence supports our confidence that the jury's verdict is worthy of confidence.

-19-

*First.*  The evidence suggests Ford was eager to sell Heavilin a third machine gun, despite diminished pressure from Heavilin.  Heavilin told Ford on November 17 that a dealer in Colorado Springs might be willing to sell him a machine gun.  Because Heavilin told Ford another dealer was available, the pressure on Ford to procure a third machine gun had been substantially reduced.  But instead of acting relieved, Ford decided to complete the sale.  Ford called Heavilin two days later and told him he found a third machine gun.  Because Ford reinitiated contact with Heavilin after the November 17 discussion, when Ford was told Heavilin could buy the machine gun elsewhere, this phone call suggests Ford was ready and willing to engage in the illicit transaction.

*Second.*  Ford insisted on completing the third transaction despite Heavilin repeatedly telling him he did not need to.  When they met on October 18, 2005, and discussed another sale, Heavilin told Ford that he is "going to leave the decisions up to him."  R., Vol. X at 6.  Heavilin explained at trial that he was referring to "whether [Ford] is able to do it safely without getting in trouble or any complications on his part. . . .  If he doesn't want to do it, get out of it."  *Id.*  Later in the October 18 conversation, Heavilin also told Ford "if it isn't safe, screw it."  *Id.*

And unlike the prior sales, when they met for the gun and money exchange on November 21, Ford initially gave Heavilin a decoy machine gun.  When the

sale did not result in the immediate appearance of law enforcement officers, Ford told Heavilin that the gun was actually a fake; he wanted to make sure police were not monitoring the transaction. Heavilin then told Ford he did not need to complete the transaction if he was worried. Ford insisted they go ahead and complete the sale, met Heavilin at a second location, and gave Heavilin the real gun. Ford's careful planning and his insistence on finalizing the transaction supports the prosecution's argument that Ford was predisposed toward committing the crime.

*Third.* The evidence shows for the first time Ford thought he would make a "decent" profit from selling a machine gun. As he testified, the third sale "was the first one I was actually going to make a decent profit on." R., Vol. XIV at 37. Ford agreed to pay his dealer $5,000 for the gun and then charged Heavilin $5,400. This testimony about the third transaction suggests Ford was predisposed toward completing the last sale, even if he was induced to commit the previous two. *See Mendoza-Salgado*, 964 F.2d at 1002–03 (explaining that the defendant's desire for profit from an illicit transaction supports an inference that he was predisposed to committing the crime).

*Fourth.* The nature of the contacts between the first two sales and the third sale is significant. By the time the third sale occurred, however, any previous entrapping influence exerted by the government had dissipated. In contrast to the

first two sales where the jury found that Ford was entrapped, fewer contacts were made before the third sale where the jury did not find entrapment. And we agree with the district court that the substance of Ford's October 5 email shows he was responding to Heavilin's request for a gun, thus allowing Ford to convincingly argue the government initiated the idea of the third sale. The additional email contacts for the third sale would not have substantially changed the picture before the jury.

*Fifth*. The government produced evidence indicating Ford possessed the fully automatic AR-15, long before Heavilin asked to buy it. To prevail on the third sale and overcome Ford's entrapment defense, the government only needed to prove Ford knowingly possessed *or* transferred this weapon. *See* 18 U.S.C. § 922(o); *see also* Jury Instruction No. 17 ("Defendant is charged in Count 3 of the Indictment with a violation of 18 U.S.C. § 922(o), which makes it a crime to knowingly transfer or knowingly possess a machine gun."). If the fully automatic AR-15 had been part of Ford's collection before Heavilin asked him to procure it, then the jury would be free to find that Ford could not have been entrapped; he already illegally *possessed* the weapon, regardless of the eventual transfer.

Ford's co-worker Hee testified that in 2003 the two of them visited a cabin owned by Ford. Ford brought the fully automatic AR-15 to the cabin, and they took turns shooting it at targets. Hee also testified that while he was visiting

Ford's house in May 2005, Ford again showed him the AR-15. Hee insisted the gun he shot in 2003 and saw in Ford's residence in May 2005 was the same weapon Ford sold to Heavilin on November 21, 2005.[13]

In addition, two investigators who interviewed Ford after he was arrested also testified that Ford admitted he had possessed the AR-15 for an extended period of time, before selling it to Heavilin. Detective William Gallegos said Ford told him he had owned the weapon and had previously fired it. Similarly, FBI agent Brian Schmitt testified Ford had admitted that he had owned the weapon for a long time.

Rick Tarvin, an acquaintance of Ford, also testified that he had never sold Ford an AR-15 or any other machine gun. This evidence is significant because Ford claims Tarvin sold him part of the machine gun just a few days before he resold the weapon to Heavilin.

_____

[13] The dissent highlights how Hee testified that in May 2005 he saw both the third machine gun and the second machine gun, and thus the jury "was plainly free not to [convict]" for the second transaction on account of this evidence, and thus the dissent reasons, the "materially identical" evidence as to the third transaction also would not support entrapment. Dissent at 21 n.9. However, the evidence supporting possession for the third machine gun was not materially identical, as Hee's testimony showed he had both longer and more significant contact with the third machine gun. Hee not only saw Ford possess the third gun two years prior to the transaction, he also fired the third gun in full automatic mode.

-23-

In its closing statement, the government repeatedly emphasized this evidence indicating Ford had illegally possessed the AR-15 long before Heavilin asked him to procure the weapon. To be sure, Ford's counsel contested this testimony in the closing statement, arguing all of the government's witnesses were not credible on this point.

In light of the strong evidence undermining Ford's entrapment defense for the November 21 transaction, we conclude there is not a reasonable probability that the three undisclosed emails would have changed the outcome of the trial.

**2.**

Ford nonetheless makes three arguments supporting his claim that the case was a close one, and therefore *any* additional evidence of entrapment might have made a difference.

(1) Ford first points to the contents of the emails. He contends the emails are material to his entrapment defense because they show that (a) the idea for the third gun transaction came from Heavilin, (b) Ford was reluctant to sell Heavilin the gun, and (c) Heavilin repeatedly urged him to commit the crime. We disagree, and conclude the contents of the emails are not material.

First, Ford argues that the jury might have misinterpreted the October 5, 2005 email as suggesting the idea for the third sale originated from Ford. As the argument goes, the pre-October 5 email is material because it would have

definitively shown the idea for the third sale came from Heavilin. But Ford never used the October 5 email to cross-examine Heavilin or to establish that he was responding to one of Heavilin's earlier requests (by email or phone) for a gun. In this light, it is hard to place great weight on the exact wording of the email since the parties did not do so at trial. We thus agree with the district court that the content of this undisclosed email was not material to Ford's entrapment defense because the jury could only conclude that "Heavilin raised and discussed the subject of a third machine gun" and thus positioned Ford "to argue as he did at trial that the idea and impetus for a third machine gun was Heavilin's." Dist. Order at 14. And in any event, the origination of the idea for the third transaction is not dispositive of the overall predisposition question. Even assuming the government first approached Ford regarding a third sale, it could still rebut the entrapment defense by other evidence of predisposition. *See generally United States v. Mendoza-Salgado*, 964 F.2d 993, 1002–03 (10th Cir. 1992).

Even so, the government did not repeatedly urge the jury to conclude that Ford originated the idea for the third weapon transaction in the October 5 email. For example, in its closing arguments, the government never suggested the idea for the third transaction originated with Ford rather than Heavilin.[14] Also, the absence

---

[14] The government made a brief reference in opening statement which may have suggested that Ford initiated the idea for the third sale. R., Vol. VIII at 170.

(continued...)

of the pre-October 5 email did not prevent Ford from arguing that the idea for the third transaction originated with Heavilin, an argument he in fact did pursue, Dist. Order. at 11. Thus, we agree with the district court that while the government may have "contended that there was no entrapment [] because the idea and impetus for the third illegal weapon came from defendant," Dist. Order at 3, we also agree with the district court that the pre-October 5 email "is not material, but instead, is largely cumulative." *Id.* at 14.[15]

Furthermore, the jury also heard of evidence after the October 5 communication indicating the idea for the last transaction was raised by Heavilin. The jury heard the audio of an October 18, 2005 conversation, in which Heavilin tells Ford he would like to purchase a third machine gun.[16] In cross-examination,

_____

[14](...continued)
That fleeting suggestion was not raised in closing argument, and we see no other clear reference to the government pursuing the argument during trial, let alone a repeated suggestion.

[15] To clarify, highlighting the government's lack of emphasis at trial on Ford initiating the third transaction, does not impugn the district court's findings. Dissent at 13 n.4. We are in agreement: the government did argue (albeit briefly) that Ford initiated the transaction, Ford repeatedly claimed Heavilin initiated the transaction, and thus the pre-October 5 email would have been favorable, but not material. We, like the district court, "cannot say that the admission of Heavilin's missing e-mail might have affected the outcome of the trial." Dist. Order at 14.

[16] In this conversation, Heavilin also briefly references an email he previously sent to Ford asking if a third machine gun was available, so the jury would have been aware of prior email traffic. *See* R., Vol. I, Doc. 196 at 9. This evidence further suggests the idea for the transfer originated with Heavilin.

Heavilin admitted he initiated the discussion of the weapon in the October 18 meeting. Defense counsel asked Heavilin, "And you tell [Ford] at that point about your desire to have a third weapon and how you got the money ready this time, right?" Heavilin responded, "Yes, sir." R., Vol. X at 74.[17] In sum, the email is not material and does not undermine our confidence in the jury's conclusion that Ford was predisposed to commit the crime.

We also reject Ford's argument that the undisclosed October 28 email provided material evidence showing he was reluctant to sell Heavilin the third machine gun. In the email, Ford tells Heavilin that no weapons were currently available. Ford's claims about the importance of this evidence are not persuasive because the content of the email was largely cumulative. At trial, Ford was able to present unrebutted evidence showing that on October 18 and November 17 he told Heavilin that no machine guns were currently available.

A close look at the October 28 email, furthermore, shows only weak support for Ford's claim that he was reluctant to procure the weapon. In the email, Ford said he was currently *unable* to procure the machine gun. He did not state or

_____

[17] In light of this cross-examination, the dissent's citation of Heavilin's direct examination about the October 18 conversation as evidence that the government "repeatedly argued that the evidence proved Mr. Ford instigated the discussions about a third gun sale," Dissent at 5, is overly generous. The October 18 discussion did not show, and was not argued to show, that Ford initiated the third sale.

suggest he was *unwilling*. In fact, Ford tells Heavilin that he is "still watching" for an available weapon. R., Vol. I, Doc. 196 at 14. At best, the email cuts both ways for Ford.

Finally, we reject the contention that the emails provided material evidence showing Heavilin repeatedly pressured him to commit the crime. Out of the twelve communications initiated by Heavilin leading up to the last transaction, two more emails do not add up to much more. Moreover, nothing in the record suggests Heavilin had more aggressively asked Ford about the machine guns in the pre-October 5 and pre-October 28 emails compared to the communications before the jury.[18]

In sum, we conclude the contents of the undisclosed emails were not sufficiently material to cast doubt on the jury's verdict.[19]

_____

[18] In fact, the content of Ford and Heavilin's emails were not a big selling point at trial. Not all of the emails are contained in the record on appeal, and the ones that are supplied are relatively benign: they show that Heavilin and Ford used the email traffic primarily to keep communications open and to set the stage for subsequent phone calls and meetings where the parties conducted their business.

[19] Ford also argues the government used the undisclosed emails against him by suggesting he was lying about the existence of additional emails. In support of this argument, Ford cites the following passage from the government's rebuttal closing argument:

> And what you understand as the jury, I am sure, is that the defense has access to the same information that the government does, and despite the defendant's counsel telling you that the defendant was not

(continued...)

-28-

(2) Second, Ford emphasizes that the jury acquitted him of the first two sales, suggesting the evidence supporting his conviction on the third count was weak. But as we have already explained, substantially different circumstances existed between the November 21 sale and the prior two sales. Acquittal on the first two counts, therefore, does not imply that the evidence supporting the third count was weak. *See Nguyen*, 413 F.3d at 1181.

(3) Finally, Ford suggests the case was close based on the fact that the jury took a day and half to deliberate, asked the judge certain questions about the evidence, and asked to see certain trial exhibits corroborating Ford's testimony. But this fact does nothing to show which counts, if any, concerned the jury. We can only speculate whether the jury had any concerns in particular about the quality of the evidence for the third count.

---

[19](...continued)
willing to possess and sell machine guns, where is it? Where does he say that?

R., Vol. XV at 194.

In this passage, however, the prosecutor was not referring to emails or any other specific evidence. Instead, the prosecutor was merely arguing that the overall record indicates Ford was predisposed toward possessing and selling machine guns. As explained above, the presence of two more emails from Heavilin would not have materially undermined the strength of the government's case.

In sum, in light of the strong evidence that Ford was predisposed to possessing the third machine gun and selling it to Heavilin, we conclude the three non-disclosed emails were not material to Ford's defense.

### III. Conclusion

Because Ford failed to establish a *Brady* violation, the district court did not err in denying Ford's motion for a new trial. Therefore, we AFFIRM the district court's denial of Ford's request for a new trial.

07-1176, *United States v. Ford*
**PARKER**, Senior District Judge, concurring:

I agree with Judge Tymkovich's thorough analysis of the cumulative nature of the email evidence that was not made available to the jury. I concur in his conclusion that the three emails undisclosed to the jury were not sufficiently material to the Defendant's entrapment defense to undermine confidence in the jury's verdict of guilty on Count 3. This affirms the conclusion of the trial judge who personally observed the presentation to the jury of evidence of more than one hundred communications between undercover agent Keith Heavilin and Defendant Ford. I write in concurrence to emphasize Judge Tymkovich's fifth reason for concluding that the evidence presented to the jury convincingly demonstrated that the Defendant was predisposed to possess the illegal, fully automatic Olympic Arms AR-15 machine gun ("AR-15") which was the subject of Count 3.

As Judge Tymkovich noted, Count 3 charged Defendant with violating 18 U.S.C. § 922(o) by knowingly transferring **or knowingly possessing** a machine gun.

At trial, the government presented to the jury evidence that Defendant possessed the AR-15 as far back as 2003 or earlier, long before Defendant met Agent Heavilin. The evidence is undisputed that Heavilin and Defendant first met on February 7, 2004.

The government's witness James Hee gave the following testimony before the jury. Hee met the Defendant in 1999 in a firefighter training academy and they

developed a very strong friendship. Hee stayed in Defendant's home on visits during 2001 and 2002 and Hee invited Defendant to stay at Hee's home. In 2003, Hee saw a number of weapons, including the AR-15, while visiting Defendant at his home. Sometime later during 2003, Hee accompanied Defendant to Defendant's cabin where Defendant fired the AR-15 "a little bit" and then allowed Hee to "take a few shots with it . . ." *See* R. Vol. XI at 17. The AR-15 fired in a fully automatic fashion.

Hee felt very close to the Defendant and considered Defendant almost a blood brother because they both were firemen. In 2003, Hee grew concerned because Defendant's behavior and demeanor changed after September 11 and Defendant became "paranoid" and worried about the country's security. *See* R. Vol. X at 225; Vol. XI at 9. Defendant gave Hee a list of military equipment with "nomenclature" that "regular people" should not "have access to" causing Hee to be suspicious of Defendant's activities. *See* R. Vol. X at 226-227. Hee's worries heightened when Defendant wanted to find out "if they were going to declare marshal law and disarm us . . ." *See* R. Vol. X at 228. The list of military equipment that Defendant had given Hee made Hee nervous enough to take action, but because Defendant was Hee's good friend and Hee did not want to get Defendant in trouble, instead of contacting the local police Hee reported Defendant's list to another firefighter who was affiliated with law enforcement through arson investigation services.

Eventually the Federal Bureau of Investigation ("FBI") contacted Hee who told the FBI about Defendant's weapons, which were placed on a list dated February 5, 2004 that was shown to the jury (Government's Exhibit 64). The list included the AR-15. Significantly, the list bears a date of February 5, 2004 – two days before undercover agent Heavilin first contacted Defendant on February 7, 2004. This documentary evidence corroborates Hee's testimony that Defendant had possessed the AR-15 before Defendant first met Heavilin who, therefore, could not have entrapped Defendant by inducing Defendant to gain possession of the AR-15.

Further corroboration of Mr. Hee's testimony was provided by two law enforcement witnesses. William Gallegos, a detective in the Intelligence Bureau of the Denver Police Department, interviewed the Defendant. During the interview, Defendant said that the AR-15 was "a weapon he had had for some time . . ." *See* R. Vol. XI at 146. In addition, Defendant admitted to Detective Gallegos that Defendant had fired the AR-15 "at some point in time." *See* R. Vol. XI at 147.

Brian Schmitt, a special agent with the FBI, also interviewed the Defendant. Agent Schmitt testified the Defendant told him "he had had this weapon for a long time. It was in two pieces. If the two pieces were put together, it would fire fully automatic, and that he had shot this weapon on several occasions." *See* R. Vol. XI at 189. Agent Schmitt further testified that Defendant "made a comment to the

extent that he knew it was wrong to have it, he knew it was wrong to sell it, but he did it anyway." *See* R. Vol. XI at 190.

In jury instruction number 17, the trial judge carefully instructed the jury that Defendant was charged in Count 3 with a violation of 18 U.S.C. § 922(o), which makes it a crime to knowingly transfer **or knowingly possess** a machine gun; that the government must prove beyond a reasonable doubt the Defendant knowingly transferred **or knowingly possessed** the AR-15; and that Defendant knew the firearm he transferred **or possessed** was a machine gun. The judge then instructed the jury that if the government proved the essential elements beyond a reasonable doubt, the jury should find Defendant guilty of knowingly transferring **or knowingly possessing** a machine gun as charged in Count 3 but that if any essential element was not proven beyond a reasonable doubt, then the jury should find defendant not guilty of knowingly transferring **or knowingly possessing** a machine gun as charged in Count 3.

In a separate verdict form pertaining to Count 3, the trial judge repeated the alternative grounds for conviction:

**"VERDICT FORM – COUNT 3**

We, the jury, on our oaths, unanimously find defendant, STAN

TARAN FORD, as to the crime of knowingly transferring **or**

**knowingly possessing** a machine gun, as charged in Count 3 of the

Indictment, the essential elements of which are set forth in

Instruction No. 17:

    _____          Not Guilty

    __<u>X</u>___ Guilty"

(Emphasis supplied).

The Supreme Court of the United States, in a case where there were

alternative statutory grounds for a guilty verdict, unanimously[1] held that "a

general jury verdict was valid so long as it was legally supportable on one of the

submitted grounds – even though that gave no assurance that a valid ground,

rather than an invalid one, was actually the basis for the jury's action." *Griffin v.*

*United States*, 502 U.S. 46, 49 (1991).

The Tenth Circuit has followed the rule in *Griffin* multiple times. *See,*

*e.g., United States v. Haber*, 251 F.3d 881, 889 (10th Cir. 2001) (stating that

although jury unanimity issue was not properly preserved for appeal, it would

---

[1] Seven justices joined in the majority opinion authored by Justice Scalia; Justice Blackmun wrote a concurring opinion; Justice Thomas took no part in the decision.

nevertheless affirm a general verdict in which court instructed jury that it could find defendant guilty of mail fraud based upon either a scheme to defraud or a scheme to obtain money by false pretenses); *United States v. Vaziri,*164 F.3d 556, 566 (10th Cir. 1999) (upholding general verdict on one count of the indictment, which charged a multiple-object conspiracy involving LSD, methamphetamine, cocaine, and marijuana even though evidence did not support each object of conspiracy); *United States v. Bell*, 154 F.3d 1205, 1209 (10th Cir. 1998) (upholding general verdict on count alleging conspiracy to distribute cocaine and crack cocaine even though evidence supported only distribution of crack cocaine); *United States v. Linn*, 31 F.3d 987 (10th Cir. 1994) (upholding general verdict on count alleging conspiracy to commit arson, mail fraud, wire fraud, and money laundering even though evidence did not support all theories). Recently, in *United States v. Vigil*, 523 F.3d 1258 (10th Cir. 2008), this Court affirmed a holding by the United States District Court for the District of New Mexico that expressly followed *Griffin*. *See United States v. Vigil*, 478 F. Supp.2d 1285, 1302 (D.N.M. 2007) (Defendant convicted of attempted extortion either by wrongful use of actual or threatened fear, or under color of official right), *aff'd on other grounds,* 523 F.3d 1258 (10th Cir. 2008). The jury had ample evidence from which it could have determined in regard to Count 3 that Defendant Ford possessed the AR-15 before he first met undercover agent Heavilin. In that

circumstance, Defendant's entrapment defense would have had no application to Defendant's illegal possession of the AR-15; the jury could have convicted the Defendant under Count 3 on the ground of possession without even having to consider whether undercover agent Heavilin entrapped Defendant with respect to the sale of the AR-15. The jury's verdict on Count 3 is therefore supportable on the ground of possession even if it were invalid with respect to the ground of transfer of the AR-15, although I believe the general jury verdict was valid as to either ground. This is a strong reason, in addition to the missing evidence being cumulative in nature, to have confidence in the jury's verdict.

07-1176, *United States v. Ford*
**GORSUCH, J.,** Circuit Judge, dissenting


Stan Ford, a Denver firefighter, had no criminal record and no known involvement with illegal firearms until an undercover government agent, Keith Heavilin, approached Mr. Ford and repeatedly solicited his assistance in procuring illegal weapons. Eventually, Mr. Ford obtained three such weapons and sold them to Mr. Heavilin. At trial, the jury acquitted Mr. Ford in connection with the first two sales, finding that he was entrapped by the government's agent. In connection with the third sale, the jury convicted Mr. Ford. But the jury convicted on this count only after the government argued that, whatever else the evidence at trial suggested, it definitively established that the idea for the third gun sale originated with Mr. Ford, not the government's agent.

We now know the government's critical representation to the jury at trial about the initiation of the third gun sale was in error. The suppressed pre-October 5[1] email definitively shows that Mr. Heavilin conceived and heavily promoted the idea of a third transaction, just as he had the two previous gun sales for which Mr. Ford was acquitted. For this reason, and while I agree with much else in the court's thoughtful analysis, I cannot help but conclude that the suppressed pre-

---

[1] We do not know the date of this email except that it was sent before October 5. I follow the court's convention in referring to this email as the "pre-October 5" email.

October 5 email was material to Mr. Ford's entrapment defense. Accordingly, I would reverse and remand this matter for a new trial on count 3.

I

*Brady v. Maryland*, 373 U.S. 83 (1963), recognized that, for a trial to be worthy of our judicial system, the accused must have access to all material exculpatory evidence in the government's possession. "A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him . . . casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice." *Id.* at 87-88. Such a prosecution is also inconsistent with the role of the government lawyer in our legal system. To be sure, the prosecutor "is not a neutral, he is an advocate; but an advocate for a client whose business is not merely to prevail in the instant case. [The government's] chief business is not to achieve victory but to establish justice. . . . [and] the Government wins its point when justice is done in its courts." *Id.* at 88 n.2 (quoting an address of former Judge and Solicitor General Simon E. Sobeloff).

To establish a violation of the due process imperative embodied in *Brady*, a criminal defendant need not prove any malicious intent on the part of the prosecution in suppressing evidence. *Id.* at 87. Rather, a defendant must demonstrate simply that "(1) the prosecution suppressed evidence, (2) the

evidence was favorable to defendant, and (3) the evidence was material." *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999). The court today concludes that Mr. Ford has satisfied the first two essential elements of a *Brady* claim, and I agree. Maj. Op. at 14-16. There is no dispute that the government failed to produce the pre-October 5 email at trial, and neither is there any question that the email was favorable to Mr. Ford, showing as it does that Mr. Heavilin, not Mr. Ford, initiated discussions about a third gun sale. As the district court found, the pre-October 5 email "corroborate[s] [Mr. Ford's] claim that the idea and impetus for the third illegal machine gun was broached and pursued by [Mr.] Heavilin, not the defendant, and . . . [goes] to credibility because to some extent [it] contradicted [Mr.] Heavilin's and Agent Schmitt's testimony that the idea and opportunity for the third machine gun came from defendant 'out of the blue.'" Dist. Ct. Op. at 11.

The only real question before us is whether the suppressed pre-October 5 email was material to Mr. Ford's defense. We review this question *de novo*. *United States v. Smith*, 534 F.3d 1211, 1221-22 (10th Cir. 2008); *United States v. Redcorn*, 528 F.3d 727, 744 (10th Cir. 2008). And in doing so, we ask whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 681-82 (1985). In turn, a "reasonable probability" is

-3-

understood to mean a "probability sufficient to undermine confidence in the outcome." *Id.* at 682. This inquiry "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Instead, the touchstone is simply whether the ultimate verdict is one "worthy of confidence." *Strickler v. Greene*, 527 U.S. 263, 290 (1999).

Though reluctant to part ways with my colleagues, I am convinced the pre-October 5 email was material based on the confluence of the following factors:

*First*, the suppressed exculpatory evidence is dispositive of what we have repeatedly recognized to be the "central question" in entrapment cases. In order to convict Mr. Ford for his role in the third gun sale, the government had to prove beyond a reasonable doubt that Mr. Ford was not entrapped. *See* Jury Instruction No. 17. As we have recognized is true in most cases raising the entrapment defense, the "central question" before the jury in this trial was whether the government or the defendant initiated the illegal activity. *See United States v. Dozal-Bencomo*, 952 F.2d 1246, 1250 (10th Cir. 1991). The suppressed pre-October 5 email definitively answers this central question, proving that it was the government's informant, not Mr. Ford, who instigated the third gun sale. As the district court explained, the suppressed email, in which Mr. Heavilin "exhort[ed] [Mr. Ford] to locate and sell" the third gun, "corroborated [Mr. Ford's] claim that

-4-

the idea and impetus for the third illegal machine gun was broached and pursued by [Mr.] Heavilin." Dist. Ct. Op. at 11.

*Second*, in the absence of the pre-October 5 email, the government at trial was able to paint a gravely inaccurate picture on the central question before the jury. The government submitted evidence to the jury suggesting that the idea for a third weapon sale originated with *Mr. Ford*, specifically an October 5 email from Mr. Ford in which he plainly appears to be promoting a third gun sale to Mr. Heavilin, indicating that there are "[n]ot any good [gun] deals out there right now. . . . Just keep watching . . . ." *See* Dist. Ct. Op. at 13. The government also repeatedly argued that the evidence proved Mr. Ford instigated the discussions about a third gun sale; as early as its opening statement the government told the jury that, after the sale of the second gun on August 2, "*[i]t is the defendant who at that point comes back to Mr. Heavilin, and leads us up to the date of October 18th of 2005*." R. Vol. VIII at 170 (emphasis added); *see also* R. Vol. IX at 171; R. Vol. X at 4 (other instances of government pursuing this theory throughout trial). The district court expressly found that, "[a]s to count three, . . . the government contended that there was no entrapment by Heavilin *because the idea and impetus* for the third illegal weapon came from defendant." Dist. Ct. at 3; *see also id.* at 11 (stating that the pre-October 5 email "contradicted Heavilin's and Agent Schmitt's testimony that *the idea* and opportunity for the third machine gun

came from defendant 'out of the blue.'"). With the benefit of the pre-October 5 email, we now know that the government's evidence and argument at trial on the central question before the jury was in error.

*Third*, the absence of the pre-October 5 email appears to answer why the jury convicted Mr. Ford on count 3 even after acquitting him on counts 1 and 2. To carry its burden of showing Mr. Ford was not entrapped, the government had to establish one of three things – (1) the idea for the third gun transaction did not originate with government agents; (2) the government agents did not persuade or talk Mr. Ford into committing the crime; or (3) Mr. Ford was predisposed to commit the crime. *See* Jury Instruction No. 22. With the exception of the pre-October 5 email, the nature and quality of the evidence the government relied on to carry its burden under these elements was materially identical across all three counts. It was only on count 3, and only by virtue of its suppression of the pre-October 5 email, that the government could plausibly suggest that Mr. Ford initiated the idea for a gun sale. On the record before us, then, it strongly appears that, but for the suppression of the pre-October 5 email, the jury would have acquitted Mr. Ford on count 3 as well.

*Fourth*, not only did the government seek a conviction on the basis of an evidentiary omission for which it was responsible, it expressly asked the jury to draw an adverse inference about the defendant's credibility – and thus the

reliability of his entire testimony – based on its own *Brady* failure. At trial, Mr. Ford took the stand and offered extensive testimony in his defense. In the course of his testimony, as the government concedes, Mr. Ford averred that it was Mr. Heavilin, not he, who initiated discussions over a third gun sale. *See* Appellee Br. at 17 ("Defendant was . . . positioned to argue, as he did *repeatedly and forcefully at trial*, that the idea and impetus for a third machine gun was [Mr.] Heavilin's.") (emphasis added). Mr. Ford even went so far as to testify that the government had failed to produce emails from Mr. Heavilin that could confirm his account. R. Vol. XIII at 101-102. The government responded in its closing rebuttal argument by suggesting that Mr. Ford's credibility should be discounted by the jury because – in contradiction to Mr. Ford's testimony – "the defense has access to the same information that the government does." R. Vol. XV at 194. We now know the government wrongly attacked Mr. Ford's credibility and did so based on an evidentiary omission for which it bears responsibility.

*Finally*, we must be mindful that "[w]hat might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *United States v. Robinson*, 39 F.3d 1115, 1119 (10th Cir. 1994); *see also United States v. Agurs*, 427 U.S. 97, 113 (1976) (stating with respect to *Brady* violations that "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable

doubt"). To be sure, this is not a case where the withheld evidence is insignificant or minor. But neither can there be any question just how close this case was. The jury apparently accepted Mr. Ford's entrapment defense on the first two counts of possessing or transferring an automatic weapon, acquitting him of both charges. The jury found Mr. Ford guilty solely on count 3, and it reached its decision only after one and a half days of deliberation, during which time it sent a note to the court that stated jurors were divided over the question of entrapment, R. Vol XVI at 11, and asked to be provided with transcripts of certain witnesses' testimonies, R. Vol. XVII at 6. And it appears that the jury's ultimate conviction on count 3 may well have been secured only as a result of the government's failure to produce the pre-October 5 email. These circumstances testify to how narrow a thread the jury's conviction on count 3 depended, how hard the jury struggled with this case, and thus how cautious we must be in suggesting that the suppressed email was immaterial.

Given the confluence of all the foregoing circumstances, I cannot help but conclude that the jury's guilty verdict on count 3 is not worthy of the confidence of our legal system. This is not to say that Mr. Ford is surely innocent. But it is to say that he surely deserves a new trial, one in which he has access to, and the right to make use of, the exculpatory evidence the government possesses. The central promise of our criminal justice system is a trial based on all available and

competent evidence, not one based on the government's best evidence. The conviction before us, hanging on the barest of threads and dependent on the omission of exculpatory evidence, is "inconsistent with the rudimentary demands of justice." *Brady*, 373 U.S. at 87 (internal quotation marks omitted).

Neither does it matter that the government's failure to fulfill its *Brady* obligations in this case was apparently the result of oversight rather than deliberate mischief. The principle animating *Brady* and the promise of our legal system is the "avoidance of an unfair trial to the accused." *Id.* at 87. It is foundational to our legal tradition that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.'" *Id.* at 87-88. Regrettably, I cannot say that promise was fulfilled in this case.

Underscoring my conviction on this score, the government has cited to us no case affirming a conviction in the face of so many factors converging to call its reliability into question. Neither have my colleagues cited any. Meanwhile, our circuit and others have reversed for new trials in highly similar (and even sometimes arguably less troubling) circumstances – including where, as here, the

suppressed evidence "b[ore] importantly on the central issue at trial"; the prosecutor attacked the defendant's credibility for testifying about facts the government improperly withheld; and the jury "evidently struggl[ed]" with the case. *United States v. Gil*, 297 F.3d 93, 103-04 (2d Cir. 2002); *see also Kyles*, 514 U.S. at 453-54 (finding materiality and reversing for new trial where suppressed evidence could have gone, in part, to undermining the credibility of key witnesses for the prosecution); *Scott v. Mullin*, 303 F.3d 1222, 1232 (10th Cir. 2002) (finding materiality and reversing for new trial where government withheld evidence that could have assisted the defense in undermining witnesses for the prosecution); *Nuckols v. Gibson*, 233 F.3d 1261, 1266-67 (10th Cir. 2000) (same); *United States v. Minsky*, 963 F.2d 870, 875 (6th Cir. 1992) (same). I see no basis for reaching a contrary result here.

## II

The government and my colleagues suggest we need not be worried about the fairness of this trial. Though the government suppressed the pre-October 5 email, and though it was evidence favorable to Mr. Ford, the government and my colleagues suggest that the email should be deemed "immaterial." After careful consideration of each of the arguments they advance for this conclusion, I am unable to agree.

## A

The government argues that the pre-October 5 email, in its tendency to show Mr. Heavilin as the initiator of the third gun sale, was merely "cumulative" of existing evidence. But this argument depends on a misconception of the term. To qualify as cumulative, the evidence in question must be "[a]dditional evidence that supports a fact *established by existing evidence*." Black's Law Dictionary 596 (8th ed.) (emphasis added). The term "suggests a needless redundancy, especially where the additional evidence will result in 'undue delay' or 'waste of time.' Redundancy, however, means that the additional information provides *no additional relevant data points* to the jury, that they are forced to listen to evidence that tells them *nothing at all new*." *United States v. Ramirez-Lopez*, 315 F.3d 1143, 1173 (9th Cir. 2003) (Kozinski, J., dissenting) (citations omitted) (emphasis added), *majority opinion withdrawn,* 327 F.3d 829 (2003).

The pre-October 5 email cannot remotely be characterized as a needless redundancy. To be sure, the government stresses that the jury could have inferred the existence of the pre-October 5 email from the email Mr. Ford sent Mr. Heavilin on October 5. Appellee's Br. at 16-17. And maybe this is so. The problem remains, however, that, even if the jury could have reasonably inferred the *existence* of a pre-October 5 email, the *content* of that email was impossible to surmise. From the October 5 email, one arguably might be able to infer that the parties had an earlier communication. But there is simply no way to divine that

-11-

the parties' earlier communication was exculpatory in nature, showing that Mr. Heavilin initiated the idea for a third gun sale.

Notably, the government ultimately concedes as much, admitting that "the content of [Mr.] Heavilin's omitted message is unknown," and, indeed, that the jury could well have thought that the pre-October 5 email contained only "a suggestion by [Mr.] Heavilin that the two men meet socially," given "[Mr.] Heavilin's penchant for beginning his communications with Defendant without specifically mentioning his desire for a machine gun." *Id.* at 5-6. In these circumstances, the pre-October 5 email can hardly be fairly characterized as a waste of time. It alone demonstrated that Mr. Heavilin, not Mr. Ford, initiated the third gun sale. Far from cumulative, it was uniquely exculpatory.

B

The court and concurrence do not embrace the government's "cumulative" submission. Toward the end of its opinion, however, the court suggests that the pre-October 5 email is cumulative for different reasons not pursued by the government. Maj. Op. at 23-25.[2] The court's argument centers on the October 18 meeting between Mr. Ford and Mr. Heavilin in which Mr. Heavilin expressed a

_____

 [2] It is our general practice not to adduce arguments for represented parties that they have not themselves raised at any stage in the proceedings, *see, e.g., Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994), and the court does not offer any reason for departing from our general practice in this case.

-12-

desire to purchase a third weapon. From this meeting, the court reasons that, even without the suppressed pre-October 5 email, the jury was free to infer that Mr. Heavilin instigated the third gun sale. Maj. Op. at 25-26.

It appears the government did not pursue this argument before us for a good reason. The court's citations to the record merely show that, at the October 18 meeting, Mr. Heavilin said he wanted to purchase a third gun and was ready to proceed; there is *no* evidence suggesting that the first discussion of a third gun sale took place at the October 18 meeting. In fact, the jury heard that Mr. Ford and Mr. Heavilin had at least *seven* contacts (excluding the suppressed emails) after the second weapon sale and before the October 18 conversation. *See* Aplt. Op. Br. Attachment 1 (Exhibit 11 at trial). The jury also had before it the October 5 email suggesting that the idea for a third gun sale originated with Mr. Ford. *See* Dist. Ct. Op. at 13.[3] Simply put, without the suppressed pre-October 5 email, the record leaves the unmistakable impression that the earliest contact between the parties about a third gun sale was the October 5 email – an email which, without the context of its predecessor, plainly (and erroneously) suggests *Mr. Ford*

---

[3] The court contends that we cannot "place great weight on the exact wording" of the October 5 email in part because Mr. Ford never used it "to cross-examine Heavilin or to establish that he was responding to one of Heavilin's earlier requests (by email or phone) for a gun." Maj. Op. at 24. But surely we cannot fault a defendant for failing to highlight *inculpatory* evidence.

-13-

instigated the third sale.[4]

C

Ultimately, my colleagues devote most of their effort to a different argument, suggesting that, even if the government suppressed evidence showing that Mr. Ford did not *initiate* the idea for a third gun sale, other evidence before the jury conclusively demonstrates Mr. Ford's *predisposition* to possess or transfer a third gun. Maj. Op. at 19; Concurrence at 1. Because the government's evidence proves predisposition, my colleagues reason, any suppressed evidence regarding initiation is immaterial.

I concur entirely with the premise on which this argument proceeds: the

---

[4] The court agrees that the government argued to the jury that Mr. Ford initiated the third gun sale. *See* Maj. Op. at 25 & nn.17-18. But the court then seeks to downplay the significance of this fact by suggesting the government's argument on this score was "fleeting" and "brief" and therefore evidence – namely the suppressed pre-October 5 email – definitively and conclusively proving the government wrong on this score is immaterial. *Id.* With respect for my colleagues' views, I cannot see how a piece of evidence that resolves a "central question" of Mr. Ford's defense that *was disputed* at trial can be immaterial as a matter of law. *See supra* Part I. Notably, too, neither the government nor the district court has suggested affirmance would be appropriate on the ground now offered by my colleagues. To the contrary, the district court unreservedly found that the government argued and put on evidence seeking to prove that Mr. Ford initiated the third gun sale; I see no reason or authority allowing us effectively to alter and effectively undo that finding. *See* Dist. Ct. at 3 ("As to count 3 . . . the government contended that there was no entrapment by Mr. Heavilin because the idea and impetus for the third illegal weapon came from the defendant."); *id.* at 11 (Mr. Heavilin and Agent Schmitt testified that "the idea and opportunity for the third machine gun came from the defendant 'out of the blue.'").

-14-

government was free to disprove entrapment in three different ways, as enumerated in Jury Instruction 22, and so could have succeeded by showing Mr. Ford was predisposed to engage in the charged crime, even if he did not initiate conversations about it. *See supra* Section I (citing Jury Instruction 22). Nonetheless, for the following reasons I am unable to agree with the conclusions my colleagues reach from this shared premise.

1

Initiation and predisposition cannot be as neatly separated as the court's argument assumes. What is material to one is often material to the other. Under our governing precedents, a defendant's predisposition must be viewed "at the time the government agent first approached the defendant." *United States v. Garcia*, 182 F.3d 1165, 1169 (10th Cir. 1999). Although "inferences" about predisposition surely may be drawn from events occurring after the initial contact, *id.*, and the question of initiation is different from the question of predisposition, we must assess predisposition in this case at the time when Mr. Heavilin *first approached* Mr. Ford concerning the third gun sale. Given this, I do not see how the undisclosed pre-October 5 email to Mr. Ford, in which he "exhorted" Mr. Ford to find a third gun, could possibly be immaterial as a matter of law to a proper analysis of Mr. Ford's predisposition at the time Mr. Heavilin approached him, even if it does not suffice standing alone to preclude predisposition.

-15-

Shifting focus to predisposition simply does not negate the materiality of the suppressed email.

2

My colleagues' predisposition discussion focuses exclusively on the government's evidence on count 3. Maj. Op. at 19-23; Concurrence at 1-4. Yet, there is considerable countervailing evidence in the record that my colleagues do not mention, and they do not explain why they credit the government's evidence rather than the (unmentioned) evidence presented by the defense. Respectfully, I believe proceeding in this fashion is inconsistent with our role in reviewing *Brady* challenges.

To be sure, in considering the materiality of suppressed evidence in a *Brady* challenge, we may not ignore evidence suggesting a defendant's guilt. But what we also may not do is asymmetrically scan the trial record for signs that the defendant is guilty. A *Brady* challenge is not, and should not be confused with, a sufficiency of the evidence challenge – a point the Supreme Court has repeatedly underscored. *See Kyles*, 514 U.S. at 434-35. In a *Brady* challenge our obligation is to determine whether the verdict is worthy of the confidence of the judicial system in light of the suppressed evidence, when viewed "in the context of the entire record." *Agurs*, 427 U.S. at 112. Thus, in *Kyles* the Supreme Court did not hesitate to consider the totality of the evidence in the record, exculpatory and

-16-

inculpatory, and, in concluding the suppressed evidence at issue was material, the Court stressed that, while the jury could well still have found the defendant guilty in light of the considerable evidence amassed by the government, this fact simply was not dispositive of the question before it. 514 U.S. at 453.[5]

3

The court's misapplication of the *Brady* standard of review is also revealed in its exclusive focus on the government's evidence on count 3 without reference to the jury's disposition on counts 1 and 2. The court recites the government's predisposition evidence on count 3 and then proceeds to hold it convincing. The difficulty is that the jury evidently did not find the very same evidence convincing. At trial, the government's predisposition evidence was materially

---

[5] The court takes pains to represent that it has "conducted a review of the entire record." Maj. Op. at 18 n.5. I do not for a moment mean to suggest otherwise. My concern is not with the thoroughness of the court's review of the record, but with what it does with that record – namely, outline facts and draw inferences in the light most favorable to the government. This is our mode of operation in a sufficiency review, not a *Brady* challenge.

The concurrence's reliance on *Griffin v. United States*, 502 U.S. 46 (1953), and several other cases in the *Griffin* line serves to underscore the problem. *Griffin* was no *Brady* case; rather, it simply announced the following rule: "[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands *if the evidence is sufficient* with respect to any one of the acts charged." *Id.* at 56-57 (emphasis added). This standard has no place in a *Brady* challenge where we look not at the sufficiency of the government's evidence to support a guilty verdict on the charged elements, but to the fundamental fairness of the trial.

identical across all three counts. And we know that the jury *rejected* that evidence on counts 1 and 2.[6] I do not see how evidence of predisposition that the jury found insufficient to sustain a conviction on counts 1 and 2 can be evidence worthy of our confidence to sustain a conviction on count 3. I do not question that the government's evidence on count 3 may have been sufficient to sustain a conviction, or that it may prove persuasive to a jury on retrial. But those are not the questions before us.

4

An examination of the specific evidence cited by the court and concurrence highlights my preceding concerns.[7]

*First*, the court argues that Mr. Ford was "eager" to sell the weapon despite "diminished pressure" from Mr. Heavilin. Maj. Op. at 19. In support of this claim, the court points to a November 17 conversation in which Mr. Heavilin told Mr. Ford that another dealer-friend might be willing to sell him a machine gun, two days after which Mr. Ford called Mr. Heavilin with news he had found a

---

[6] Of course, the government secured a conviction on count 3. But it appears the government did so only because on that count alone, and only by virtue of its suppression of the pre-October 5 email, it could argue that Mr. Ford initiated the idea of the gun sale.

[7] Separately but not insignificantly, several of the following arguments the court and concurrence make were not briefed by either party or considered in the district court's order. *See* Appellee Br. at 15 (setting forth only reasons three, four, and part of one). Our normal practice would counsel against raising and considering them. *See supra* n. 2.

weapon. *Id.* The court, however, offers no record citations to support its assertions that Mr. Ford was "eager" to complete the sale, or that the pressure on him was diminished as a result of the conversation, and these conclusions appear only to be inferences in the government's favor. In fact, contrary evidence, unmentioned by the court, exists in the record suggesting that Mr. Ford was no more or less "eager" to complete this sale than either of the previous sales on which he was acquitted. *See* R. Vol. XIV at 29, 35-38 (testimony of Mr. Ford). Record evidence even suggests that Mr. Heavilin's actions could have increased rather than diminished pressure on Mr. Ford. *See* R. Vol. XIV at 163 (psychological testimony). The court offers us no reason to suggest that we can confidently pick one competing line of evidence over another.

*Second*, the court argues that Mr. Ford's predisposition is demonstrated by his insistence upon completing the third transaction, despite being told by Mr. Heavilin that he did not need to do so, as well as by his use of a decoy gun. Maj. Op. at 19-20. But the government's evidence on this score was identical across all three counts. For example, in its closing argument, the government expressly contended that, "contrary to the defendant's theory of entrapment, Keith Heavilin, *before each* of the three machine gun sales, told the defendant, if you are stressed, don't do it. If the safety issue is a concern, don't do it." R. Vol. XV at 161 (emphasis added); *see also* R. Vol. VI at 11-13; R. Vol. IX at 163. Likewise, the

-19-

government's closing argument emphasized that Mr. Ford engaged in counter-surveillance (of which the use of a decoy is one example) before each of the three gun transactions. *See* R. Vol. XV at 167; s*ee also* R. Vol. VI at 9-10; R. Vol. XI at 166; R. Vol. IV at 37; R. Vol. XIV at 62. I fail to see how we can safely sustain a conviction on count 3 relying on evidence the jury evidently rejected on counts 1 and 2.

*Third*, the court contends predisposition is established by the fact that Mr. Ford "for the first time" with the third machine gun sale "thought he would make a decent profit." Maj. Op. at 20. Yet, the court makes no mention of the fact that the evidence at trial showed Mr. Ford's profits on the second and third sale were similar, not different: Mr. Ford testified that he "probably made a couple of hundred dollars" on the second sale, R. Vol. XIII at 124, and $400 on the third sale, *see* R. Vol. XIV at 37; R. Vol. XIII at 111.

*Fourth*, the court argues that "[b]y the time the third sale occurred, . . . any previous entrapping influence . . . had dissipated," and that there were "fewer contacts" before the third sale than before the first two sales. Maj. Op. at 21. While I fully agree with the court that we cannot presume entrapment on the third count simply because entrapment was found on the first two counts, *see United States v. Nguyen*, 413 F.3d 1170, 1181 (10th Cir. 2005), this undisputed legal principle does not obviate the need to analyze independently the evidence tending

to prove or disprove Mr. Ford's entrapment with respect to count 3. And, again, the evidence on count 3 with respect to predisposition at trial was no different in kind or quality than the evidence the jury rejected on counts 1 and 2.[8]

*Fifth*, the court and concurrence contend that the government produced evidence at trial indicating Mr. Ford possessed the third weapon "long before" Mr. Heavilin asked to buy it. The length of this period, the reasoning goes, tends to undercut any inference that the government's informant entrapped Mr. Ford into procuring the weapon, and tends to show that Mr. Ford unlawfully possessed it on his own volition. Maj. Op. at 21-22; Concurrence at 1-4.

My colleagues begin by placing great weight on Mr. Hee's testimony that Mr. Ford possessed the third gun several months before its sale. Yet, they make no mention of the fact that Mr. Hee testified that he saw *both* of the guns that were the subject of sales 2 and 3 in Mr. Ford's possession months before the sales, *see* R. Vol. XI at 13-15; 72-77; 104-105, and that the FBI list the

_____

[8] In this section of its opinion, the court adds that "the substance of Ford's October 5 email shows he was responding to Heavilin's request for a gun, thus allowing Ford to convincingly argue the government initiated the idea of the third sale." Maj. Op. at 21. But this argument does not supply an independent reason for finding predisposition, even if Mr. Heavilin initiated discussions of the third gun sale. Rather, it simply returns us to the government's (mistaken) argument that the suppressed pre-October 5 email is cumulative evidence with respect to who, in fact, initiated the third sale. As the government itself concedes, the October 5 email simply does *not* prove, by inference, that Mr. Heavilin initiated the third sale. *See supra* Section II.A.

-21-

concurrence points to as corroboratory documentary evidence of his testimony also included both those weapons, *see* R. Vol. XI at 21. If Mr. Hee's testimony and the FBI list were as convincing as my colleagues suggest, surely the jury would have convicted on count 2. But the jury did not. And it was plainly free not to do so in light of competing evidence calling into question Mr. Hee's credibility that goes unnoted by my colleagues. *See* R. Vol. XIV at 29, 37-38 (Mr. Ford denying Mr. Hee's assertions); R. Vol. XIV at 141-45 (testimony of private investigator Ed O'Connor questioning Mr. Hee's observations). Unless we may view and credit the government's evidence in isolation, and then disregard the fact that much of it was rejected by the jury on other counts, it is hard to see how we can conclude that Mr. Hee's testimony unshakably confirms that Mr. Ford possessed the third gun before being induced by the government's informant into procuring it.[9]

---

[9] In a footnote, the court disputes that possession evidence was materially identical across counts two and three. Maj. Op. at 22 n.16. Yet in support of this point, the court simply seeks to bolster Mr. Hee's testimony, stressing that he had "both longer and more significant contact with the third machine gun" because he testified to having seen the third gun two years prior to the sale and to having fired the third gun. *Id.* I cannot subscribe to this analysis for two reasons. First, the *length* of time a defendant possesses a gun is irrelevant to whether he is guilty of 18 U.S.C. § 922(o). Second, with respect to Mr. Hee's testimony that he fired the third weapon, the court again seems to conflate a sufficiency claim with a *Brady* claim. The court makes no mention of competing evidence from a private investigator, Ed O'Connor, who testified that in a pre-trial interview with Mr. Hee, Mr. Hee stated that he never shot the third gun. *See* R. Vol. XIV at 141.

(continued...)

The court and concurrence next cite the testimony of Detective William Gallegos and Special Agent Brian Schmitt, who testified that Mr. Ford admitted in an interview to possessing the AR-15 for some time before the third sale. Maj. Op. at 23; Concurrence at 2-3. But, here again, neither the court nor the concurrence pauses to mention that Mr. Ford denied making any such admission. *See, e.g.*, R. Vol. XIV at 80-81. And neither explains why we can confidently presume that Messrs. Gallegos and Schmitt are correct and Mr. Ford is not. This is surprising given the district court's undisturbed and sensible finding that the disclosure of the pre-October 5 email "went to credibility because to some extent [it] contradicted . . . Agent Schmitt's testimony that the idea and opportunity for the third machine gun came from the defendant." Dist. Ct. Op. at 11.

Finally, my colleagues note Rick Tarvin's testimony that he never sold an AR-15 to Mr. Ford. They argue that this evidence tends to undercut Mr. Ford's testimony that he obtained part of the AR-15 from Mr. Tarvin only shortly before the third sale and only in response to Mr. Heavilin's urging. *See* Maj. Op. at 23. From this, my colleagues infer that Mr. Ford must have possessed the weapon for some time, and was predisposed to possess it without prompting from the

---

[9](...continued)
Neither does it mention similar testimony from Mr. Ford. *See* R. Vol. XIV at 47 (Mr. Ford testifying he never shot an AR-15 automatic with Mr. Hee). Finally, and most importantly, the court does not explain why we can or should credit Mr. Hee's version of events over Mr. O'Connor's or Mr. Ford's.

government's informant.  Again, however, the court gives no reason why we should have any more confidence in Mr. Tarvin's testimony than Mr. Ford's. And, in fact, an opposite conclusion is at least equally plausible.  Mr. Tarvin testified that he never sold Mr. Ford *any* machine gun, *see* R. Vol. XIV at 217, while Mr. Ford testified that he purchased *all three* of the weapons that were the subjects of counts 1, 2, and 3 from Mr. Tarvin, and did so only at Mr. Heavilin's urging, *see* R. Vol. XIV at 36-37; R. Vol. XIII at 105; *see also* R. Vol. XV at 160 (defense counsel's closing arguments).  Had the jury believed Mr. Tarvin's testimony, it would have found that Mr. Ford possessed all three weapons from other sources; did so well before making any sales to Mr. Heavilin; and thus was not entrapped into possessing or selling the weapons.  Yet, the jury acquitted Mr. Ford of unlawfully possessing or transferring the first and second weapons.  It follows that the jury may very well have rejected Mr. Tarvin's testimony and accepted Mr. Ford's testimony on where he obtained the guns from – testimony that comports with his overarching contention that he came into possession of each weapon only as a result of Mr. Heavilin's overweening influence.  The court and concurrence make no effort to explain why we can confidently discount this possibility so strongly suggested by the evidence.[10]

---

[10]  Mr. Ford also presented evidence that Mr. Tarvin had a past felony conviction and argued from this fact that Mr. Tarvin would be even more

(continued...)

* * *

The only meaningful evidentiary difference between the counts on which Mr. Ford was acquitted and convicted was the fact that, at trial, the government was able to show that Mr. Ford, rather than its informant, initiated discussions over the third gun sale. We now know, however, that Mr. Ford did *not* initiate the third gun sale: the suppressed pre-October 5 email definitively proves that. In these circumstances, I am compelled to conclude that the suppressed email was material to the question of entrapment, that its suppression deprived Mr. Ford of a fair trial, and that the resulting verdict does not deserve our confidence. With respect for the considered views of my colleagues, I dissent.

---

[10](...continued)
reluctant than the typical citizen to admit to having illegally sold weapons for fear of a particularly harsh sentence. *See* R. Vol. XV at 20-22; *see also* Jury Instruction No. 7 (informing jury that Mr. Tarvin's testimony "may be discredited or impeached by showing that he previously has been convicted of a felony").

-25-